**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**Panama City Division**

| | | |
|---|---|---|
| Mustafa A. HAMMAD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **CASE NO. _____** |
| | ) | |
| Eric D. HARGAN, | ) | |
| in his capacity as | ) | |
| Acting Secretary of the | ) | |
| United States Department of | ) | |
| Health and Human Services, | ) | |
| | ) | |
| Defendant. | ) | |
| _____/ | | |

**COMPLAINT SEEKING JUDICIAL REVIEW**
**OF DECISION OF THE MEDICARE APPEALS COUNCIL**

**A.      THE PARTIES AND JURISDICTION**

1.  This is an action for review of a decision of the Medicare Appeals

Council ("Council" or "MAC"), filed pursuant to Section 1395ff(b), of Title 42 of

the United States Code, and Section 405.1136, of Title 42 of the Code of Federal

Regulations.  This action is an appeal from an MAC decision dated September 20,

2017, MAC Docket No. M-17-7449, on "own motion" review of an Administrative

Law Judge decision, ALJ Appeal No. 1-1473648165 (issued April 27, 2017).

2.  Plaintiff, Dr. Mustafa A. Hammad, is a physician licensed in the State of Florida.  Dr. Hammad resides in this judicial district.  Therefore, venue in this district is proper.  *See* 42 U.S.C. § 1395ff(b)(2)(C)(iii); 42 U.S.C. § 405(g).

3.  Defendant is the Acting Secretary of Health and Human Services, who is the proper party defendant in this action.  *See* 42 C.F.R. § 405.1136(d).

4.  This federal action is timely filed.  A civil action to review a MAC decision must be filed within 60 days of receipt of the MAC decision, which is presumed by law to be five (5) calendar days after the date of the notice.  *See* 42 C.F.R. § 405.1136(c).  The date of the notice challenged in this civil action is September 20, 2017.  Consequently, this action is timely filed.

5.  The amount in controversy in this civil action exceeds $1,560, therefore this Court has jurisdiction to review the subject Council decision.  *See* 42 U.S.C. § 1395ff(b)(1)(E); Medicare Program; Medicare Appeals; Adjustment to the Amount in Controversy Threshold Amounts for Calendar Year 2017, 81 Fed. Reg. 65651 (Sept. 23, 2016).

**B.**     **PROCEDURAL HISTORY**

6.  This case originated when the Centers for Medicare & Medicaid Services ("CMS") assessed an overpayment against Dr. Hammad based upon a post-payment audit conducted by SafeGuard Services, LLC. ("SafeGuard"), a Zone Program Integrity Contractor ("ZPIC").  This assessed overpayment was based on

a review of claims submitted for services rendered between January 1, 2006 through December 31, 2008, to 50 Medicare beneficiaries treated by Dr. Hammad. After selecting the sample of 50 beneficiaries, and reviewing and analyzing the 811 claims submitted for those beneficiaries, SafeGuard determined that 100% of the sample claims had been paid in error; then, SafeGuard "extrapolated" the asserted overpayment to the 1,316 beneficiaries in the defined frame to come up with a purported estimated overpayment of $1,203,244.  On reconsideration, the Medicare Administrative Contractor determined that Medicare had only partially overpaid the claims, then the Qualified Independent Contractor ("QIC") further reduced the overpayment assessment when it issued partially favorable coverage determinations.

7.  Dr. Hammad challenged the resulting overpayment assessment and requested an administrative hearing.  At the hearing before an Administrative Law Judge ("ALJ"), Dr. Hammad presented the testimony of his statistical studies expert, Dr. Harold S. Haller, who testified, *inter alia*, that the small sample as drawn by SafeGuard for its overpayment audit was biased in that it was not representative of the larger universe (and frame) it purported to represent along several key factors, including that it was biased toward higher claims amounts paid per beneficiary.

8.  In an April 27, 2017 decision, the ALJ found that the statistical sample and extrapolation as conducted and produced by SafeGuard were invalid and issued partially favorable coverage determinations on certain individual beneficiary claims. Because the ALJ invalidated SafeGuard's use of statistical sampling and extrapolation, the ALJ ruled that Dr. Hammad should be liable only for the specific overpayment amounts found to be valid in the sample *without extrapolation*.

9.  On June 23, 2017, CMS requested the Council accept "own-motion" review.  The Council did so, and in a decision dated September 20, 2017, the Council reversed the ALJ's holding that the statistical sampling and extrapolation were invalid, and modified the ALJ's ruling with respect to the validity of certain claims within the sample. The Council's decision does not calculate a final overpayment assessment against Dr. Hammad; instead, the Council concluded, "the appropriate CMS contractor will recalculate the extrapolation taking into account the findings on the individual claims found at the various levels of review of this case.  MAC Decision, at 30.

10.  On information and belief, unless the Council's decision is reversed by this Court, the referenced CMS contractor will likely impose an overpayment assessment of approximately one-million dollars ($1,000,000) against Dr. Hammad.

11.  In this federal court review action, Dr. Hammad does not challenge the individual claims determinations from "the various levels of review in this case." As discussed in the following section, Dr. Hammad asserts that the Council erred in reversing the ALJ's decision and finding that SafeGuard's statistical sampling and extrapolation were valid.  In order to advise the Court and the Secretary of the serious and important matters raised here, the issues for review are set out in some detail.

## C.   STATEMENT OF SPECIFIC CLAIMS FOR REVIEW

12.  The decision of the MAC – reversing the ALJ's decision – was erroneous, in that the Council made several errors of law and findings of fact that are not supported by substantial evidence.  Consequently, this Court should reverse the Council's erroneous conclusion that SafeGuard's statistical sampling and extrapolation were valid, and remand this case to the Council with directions to calculate Dr. Hammad's overpayment assessment based only on the actual claim overpayments as determined in the various levels of review below, without extrapolation to other non-reviewed claims.

13.  More specifically, the MAC erred as a matter of law and made findings of fact not supported by substantial evidence as follows:

14.  **Error One**:  The MAC erred as a matter of law by interpreting the term "extrapolation," as used in Section 1395ddd, of Title 42 of the U.S. Code, not to

include a requirement that the underlying audit follow the laws and assumptions of
probability and statistics.  More specifically, the only reasonable interpretation of
the statutory term, "extrapolation" – in formulas using sample average and sample
standard deviation – includes a requirement of "normal distribution" as understood
and explained by statisticians who have developed and articulated the governing
standards.  As such, the Secretary's non-technical interpretation of the term
"extrapolation" is outside the range of permissible interpretations under *Chevron,
U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  *Cf.
Maxmed Healthcare, Inc. v. Price*, 860 F.3d 335, 342 (5th Cir. 2017) (describing a
*Chevron* step-two argument with regard to the meaning of the statutory term
"extrapolation" as "viable," stating:  "To be sure, Maxmed may have had a viable
argument that the only reasonable interpretation of the statutory term
'extrapolation' includes 'independence' as understood by statisticians who have
developed and articulated the governing concepts.  Such an interpretation could
place the Secretary's non-technical interpretation outside the range of permissible
interpretations under *Chevron* . . . .").

15.  Here, in unrefuted testimony, Dr. Hammad's expert, Dr. Haller,
explained in detail before the ALJ and the Council, that estimates of overpayments
extrapolated from a sample with a distribution of overpayments that is not normal
is in violation of the governing laws and principles of statistics, principally because

6

normal distribution is a "necessary condition" of extrapolation. As such, if a sample of estimated overpayments is not distributed normally, the statistical process described by the statutory term "extrapolate" cannot be performed using standard formulas, and the statutory term is distorted beyond the range of its permissible meanings.  Thus, the statutory term "extrapolate" cannot be reasonably interpreted, as the Council did here, to allow for estimating overpayments for an entire larger frame, based on a sample, a sub-set of that frame, when that sample is not normally distributed.

16.  In sum, any definition and use of the statutory term "extrapolation" that does not include a "normal distribution" of the average or stratified average overpayment in a sample is unreasonable, thus entitled to no deference under *Chevron*.  Thus, here, because of the non-normal distribution, whatever SafeGuard did in estimating the larger overpayment assessment was not "extrapolation" as that term is used and understood in the governing statute and regulations.

17.  **Error Two**:  Relatedly, the Council erred as a matter of law in concluding that Dr. Hammad was not denied due process when it issued a recoupment order against him based on a so-called "extrapolation" of findings produced by a review of a small sample of overpayments that did not follow the laws and assumptions of probability and statistics, and thus was not a statistically

valid extrapolation, as that term is used in Section 1395ddd, of Title 42 of the U.S. Code, and related rules, regulations, guidances, and manuals.

18. **Error Three**:  Also related, the Council erred as a matter of law and fact in concluding that SafeGuard "reduced the overpayment assessment [against Dr. Hammad] to the lower limit of a one-sided 90% confidence interval," and therefore did not violate Dr. Hammad's due process rights.  MAC Decision, at 14.

19.  As Dr. Haller explained in unrefuted expert reports, in the absence of a "normal distribution" of the average or stratified average overpayments from the sample, the lower confidence limit does not provide an overpayment estimate with a ninety percent (90%) probability of being less than the total overpayment from the frame.  *See, e.g.,* Haller Response To QIC Administrators Own Motion Review Memo (July 5, 2017) ("Haller Report"), at 10.

20.  The Council itself admitted having difficulty following this argument. *See* MAC Decision, at 17.  Perhaps, this is why the Council (1) failed completely to address Dr. Hammad's specific contention that the ZPIC, SafeGuard, did not "use the correct formulas for estimation," the sixth criterion for a "properly executed" "probability sample design," of Section 3.10.2 of Chapter 3, of the Medicare Program Integrity Manual ("MPIM") (references in to the MPIM in this Complaint are to the provisions as cited by the Council), and (2) concluded that the "non-normal" distribution of estimated overpayments is not a problem where "the

overpayment demands are reduced to lower confidence levels, in nearly every

assessment (including here)."  MAC Decision, at 17.  This MAC discussion

betrays a serious misunderstanding of the argument of Dr. Hammad, and his

statistical expert, Dr. Haller, (1) that it is the confidence interval *itself* that is

unreliable on account of the absence of a normal distribution of the estimated

overpayments of the sample units, and (2) that the ZPIC, SafeGuard, used the

incorrect estimation formulas in the light of the non-normal distribution, and that,

as such "extrapolation" is impermissible and invalid here.  *See, e.g.,* MAC

Decision, at 14 (stating in conclusory fashion, "the ZPIC . . . then reduced the

overpayment assessment to the lower limit of a one-sided 90% confidence

interval," while failing to address Dr. Hammad's contention that the ZPIC used the

improper formula for the confidence interval estimate); *see also id.* (MAC stating,

"There is nothing about this process that is in violation of the processes set out in

the sampling guidelines," while failing to address or refute Dr. Hammad's

evidence and argument that the ZPIC violated the sixth requirement for a valid

probability sample by failing to use the correct formulas for estimation).

21.  **Error Four**:  Also related, the Council misapplied the Secretary's

"guidelines" in CMS (formerly HCFA) Ruling 86-1, by permitting a "small

sample," with its inherent "lack of precision," to be extrapolated in the absence of

the required "lower level of a ninety percent one-sided confidence interval,"

because, as Dr. Haller explained, in the absence of a normal distribution of average overpayment amounts the required confidence interval was not respected and Dr. Hammad was denied "the benefit of the doubt resulting from any imprecision in the estimation of the overpayment," that the ninety percent one-sided confidence interval is meant to protect. *See* MAC Decision, at 7 ("the guidelines allow for smaller sample sizes and less precise point estimates, but offset such lack of precision with direction to the carriers to assess the overpayment at the lower level of a confidence interval--- generally, the lower level of a ninety percent one-sided confidence interval. This results in the assumption, in statistical terms, that there is a ninety percent chance that the actual overpayment is higher than the overpayment which is being assessed, thus giving the benefit of the doubt resulting from any imprecision in the estimation of the overpayment to the appellant, not the agency."); *see id.* at 9 ("Because of differences in the choice of a design, the level of available resources, and the method of estimation, however, some procedures lead to higher precision (smaller confidence intervals) than other methods. A feature of probability sampling is that the level of uncertainty can be incorporated into the estimate of overpayment . . . ." (quoting MPIM Ch. 3, § 3.10.2); *see also id.* 9-10 (quoting MPIM Ch. 3, §3.10.5.1, discussing requirement of using appropriate confidence interval to protect providers, and explaining that the only reason the guidelines allow for less precise sampling is because they contemplate

the confidence interval estimation to incorporate the uncertainty in the sample design).

22.  In this regard, the MAC's conclusion that "the guidelines for conducting statistical sampling are designed by CMS to allow wide latitude in sampling design <u>as long as the ZPIC assesses the resulting overpayment at the lower confidence level, generally, the lower level of a one-sided 90% confidence interval</u>," loses all meaning.  That is, (1) knowing that the ZPIC did not conduct its so-called "extrapolation" in a statistically valid way, and (2) knowing that the ZPIC used the incorrect formula to attempt to calculate the "lower level of a one-sided 90% confidence interval," such that (3) the ZPIC did not actually assess the overpayment against Dr. Hammad using a true "lower level of a one-sided 90% confidence interval," all the MAC's conclusions about the flexibility the ZPIC should be afforded in its sampling methodology are completely undermined.

23.  Implicit in the structure and text of the guidelines relied on by the MAC is that in the absence of a reliable confidence interval estimation, a provider may be denied due process when the ZPIC employs the imprecise sampling methodology contemplated by the guidelines.  That is precisely what happened here.

24.  This is the light in which this Court must assess the following Council errors with regard to whether the ZPIC, SafeGuard, complied with applicable

regulations and guidance and the propriety of the SafeGuard's selected sample and sampling methodology.

25. **Error Five**:  The Council erred in concluding that, here, the ZPIC, SafeGuard, "us[ed] the correct formulas for estimation," thus "properly executed" a "particular probability sample design."  MAC Decision, at 9 (quoting MPIM Ch. 3, § 3.10.2).  As explained in detail by Dr. Haller, "the SGS [SafeGuard] used incorrect formulas for estimation and extrapolation," because the stratified averages in SGS's selected sample were not normally distributed and the formula SGS used to calculate the purported confidence interval for the extrapolated estimation requires normally distributed stratified averages.  *See* Haller Report, at 7; *id.* at 10 (unrefuted expert testimony stating: "The laws and assumptions of probability and statistics require that the stratified average overpayments must be normally distributed in order for confidence interval methods of estimation to be valid.").  The results produced by the application of the incorrect formula are completely unreliable, and in fact were proved incorrect in this case when subjected to testing.  As such, not only did SafeGuard fail to use the correct formula for estimation, a violation of the MPIM guidelines, it deprived Dr. Hammad of the protection the 90% one-sided confidence interval is designed to confer, and thus denied Dr. Hammad of due process.

26.  In sum, (1) the MAC erred as a matter of law in concluding that Dr. Hammad was not denied due process when it imposed upon him a recoupment assessment based on the ZPIC's fatally flawed and statistically invalid estimation using the wrong formulas; and (2) no substantial evidence supports the MAC decision on this issue.

27.  **Error Six**:  More generally, the MAC erred as a matter of law in concluding that ZPICs – private contracting companies that have a financial incentive to find overpayments – need not follow the generally accepted laws and principles of statistics in order to have their statistical methods deemed "valid," and in order to draw a "statistically valid sample" as those terms are used in Section 8.4.1.1 of the MPIM, and in CMS/HCFA Ruling No. 86-1 (Feb. 20, 1986).

28.  According to the MAC Decision, the MPIM allows a contractor to "employ any sampling methodology that results in a 'probability sample.'" MAC Decision, at 8.  Putting aside the specific ways in which the ZPIC in this case failed to follow the MPIM criteria for a valid probability sample, discussed above, the MAC erred as a matter of law in concluding that a practitioner subject to an overpayment assessment has no right to challenge the "ultimate *results* of the statistical sampling when run through certain tests" for validity.

29.  The MPIM appears to provide for precisely this type of challenge. Section 3.10.1.1 states:  "An appeal challenging the validity of the sampling

13

methodology *must be predicated on the actual statistical validity of the sample as drawn* and conducted." MPIM Ch. 3, § 3.10.1.1 (effective Jan. 26, 2009) (emphasis added).

30.  In this regard, Dr. Hammad's statistical expert explained in his expert reports that the "sample as drawn" was biased and not representative of the larger universe with respect to (1) principle diagnoses on the claims, (2) procedure codes that were billed, (3) total amounts paid per beneficiary (because the sample was biased toward beneficiaries a higher volume of claims per beneficiary), and (4) that stratified average overpayments in the sample were not normally distributed.

31.  With regard to these statistical irregularities, the MAC did not take issue with the conclusions of Dr. Hammad's statistical expert, and the ALJ's findings and conclusions adopting them.  The MAC accepted that the sample used for the SafeGuard audit was biased toward the higher paid beneficiaries and that the stratified average overpayments as sampled by the SafeGuard audit were not normally distributed.

32.  However, the Council concluded that as a matter of law, a practitioner subject to an overpayment assessment on the basis of statistical sampling and extrapolation has no right to challenge a so-called "statistical sample," no matter how small, biased, and non-representative that sample may be.  This Council conclusion is an error of law.

33.  Under the Council's interpretation, a ZPIC could take a sample of, for example, five (5) out of 1,000 claims, assess them for overpayments, and "extrapolate" the overpayments to the larger universe (or frame) by multiplying the results by 200, and the practitioner subject to the "extrapolated overpayment estimate" could not challenge the sample or the extrapolated overpayment, even if an expert in statistical analysis determines by application of the accepted laws and principles of statistics that the five (5) claims used for the sample were the five (5) largest claims in the entire universe of 1,000 claims, and thus the sample was completely biased and non-representative of the larger universe.

34.  Due process and the statutory and regulatory framework governing the post-payment overpayment assessment process require that analysis of a sample that can be shown to be biased and non-representative in material ways cannot be "extrapolated" to form the basis for a larger estimated overpayment.

35.  The invalidity of the sampling and extrapolation procedures and results here (including the selection of a biased, non-representative, and non-normally distributed sample) cannot be corrected retrospectively.

36.  This case, being a review of an administrative decision, is exempt from initial disclosure and discovery procedures.

37.  Plaintiff is serving Defendant by sending a copy of the summons and complaint by registered or certified mail to the General Counsel, Department of

Health and Human Services, 200 Independence Avenue, S.W., Washington, DC 20201.  Plaintiff is also serving the Attorney General of the United States and the United States Attorney for the Northern District of Florida in accordance with Rule 4(i) of the Federal Rules of Civil Procedure.

 **WHEREFORE**, Plaintiff seeks and order and judgment from this Court:

 1.  Reversing the MAC decision that invalidated the ALJ decision invalidating SafeGuard's sampling and extrapolation;

 2.  Ordering the MAC to determine any overpayment assessment against Dr. Hammad based only on the specific individual claims determinations as rendered, and without regard to extrapolation or estimation;

 3.  For such other relief to which Plaintiff may be entitled.

       Respectfully submitted,

       /S/ Sean M. Ellsworth
       Sean M. Ellsworth, Esq.
       Florida Bar No. 39845
       Ellsworth Law Firm, P.A.
       420 Lincoln Road, Suite 601
       Miami Beach, Florida 33139
       (305) 535-2529 (phone)
       (305) 535-2881 (fax)
       sean@ellslaw.com

       Christopher A. Parrella, J.D., CHC, CPC
       2333 Brickell Avenue, Suite A-1
       Miami, Florida 33129
       (*Pro Hac Vice* Motion to be filed)

       *Attorneys for Plaintiff*