# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PANAMA CITY DIVISION

**Mustafa A. HAMMAD,**

     **Plaintiff,**

**v.**                                         **Case No. 5:17-cv-00288-RH-GRJ**

**Alex M. AZAR II,**
**in his capacity as Secretary of the**
**United States Department of**
**Health and Human Services,**

     **Defendant.**
_____

## DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Defendant, Alex M. Azar, II, in his official capacity as Secretary of the United States Department of Health and Human Services (hereinafter "Defendant" or "Secretary of HHS"), by and through the United States Attorney for the Northern District of Florida, moves for judgment on the pleadings pursuant to Rule 12(c ), or in the alternative, for summary judgment pursuant to Rule 56, of the Federal Rules of Civil Procedure.  Pursuant to 42 U.S.C. § 1395ff(b)(1)(A), Plaintiff has filed this civil action for judicial review of a final decision of the Secretary of HHS, rendered by the Medicare Appeals Council.  Because the final agency decision is supported by substantial evidence and comports with the applicable legal guidelines, the final

agency decision should be affirmed.[1]

## I.   <u>Introduction</u>

Defendant, Alex M. Azar, II, in his official capacity as Secretary of the United States Department of Health and Human Services (hereinafter "Defendant", "Secretary," or "Secretary of HHS"), by and through the United States Attorney for the Northern District of Florida, submits this memorandum in support of his Motion for Judgment on the Pleadings and/or for Summary Judgment.  Having exhausted his administrative remedies, Plaintiff has filed a civil action pursuant to 42 U.S.C. § 1395ff(b)(1)(A), for judicial review of the final agency decision denying certain of Plaintiff's Medicare claims and determining that Plaintiff had received an overpayment.  The final agency decision, which may be found in the Administrative Record at pages 00004 – 00046, comports with the applicable legal guidelines and is supported by substantial evidence.[2]  Accordingly, the final agency decision should be affirmed.

## II.   <u>Legal background: post payment Medicare claim determinations; appeals</u>

Congress created Medicare under Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*  Medicare is operated by the Centers for Medicare & Medicaid

---

[1]      *See* Doc. 11 at 3 (stating that "Motion practice in accordance with Rule 12(c) (judgment on the pleadings) or Rule 56 (summary judgment) of the Federal Rules of Civil Procedure is not necessary in a case of this nature).

[2]      Hereinafter, citations to pages in the Administrative Record will be designated by "AR" followed by the applicable page number(s), for example, "AR 00004 – 00046."

Services ("CMS"), an agency within HHS, with many administrative functions performed by various Medicare contractors.  Medicare is "a massive, complex health . . . program . . . embodied in hundreds of pages of statutes and thousands of pages of often interrelated regulations . . ."  *Shalala v. Ill. Council on Long Term Care*, 529 U.S. 1, 13 (2000).  The program currently processes over a billion claims for payment each year.  *See Palomar Med. Ctr. v. Sebelius*, 693 F.3d 1151, 1156 (9th Cir. 2012) (citation omitted).

In light of this enormous volume of claims, Medicare payments are generally issued upfront on an "honor system."  *See Bertschland Family Practice Clinic, P.C. v. Thompson*, No. IPO1-562-CH/F, 2002 WL 1364155, at *2 (S.D. Ind. June 4, 2002).  But since the Secretary must ensure that only proper expenditures are made, those upfront payments are not the end of the matter:

> . . . [I]nitial payment for services under Medicare is ordinarily made as long as the [Medicare] claim does not contain glaring irregularities on its face. . . (citation omitted). [Medicare contractors] then conduct post-payment audits to ensure that payments are made in accordance with applicable Medicare payment criteria.  When payment is made erroneously, an 'overpayment' is assessed  . . . (citations omitted).

*Gulfcoast Med. Supply, Inc. v. Sec'y, Dep't of Health and Human Servs.*, Case No. 8:04-CV-2610-T-26EAJ, 2005 WL 3934860 *2 (M.D. Fla. Nov. 16, 2005), *aff'd* 468 F.3d 1347 (11th Cir. 2006).  Post payment reviews of Medicare claims are often undertaken when the Medicare program detects deviations in a physician's billing from established norms. *See United States v. Sanet*, 666 F.2d 1370, 1372 (11th Cir.

1982).  Typically, a post payment review is conducted by the Medicare contractor selecting a statistical sample of the physician's claims; calculating the error rate for the claims; and, if the error rate is found to be high, then extrapolating to the universe to calculate an overpayment amount.  *See CMS Ruling 86-1* (establishing use of sampling and extrapolation in post payment audits of Medicare claims);[3] *Chaves County Home Health Servs., Inc. v. Sullivan*, 931 F.2d 914 (D.C. Cir. 1991) (upholding use of sampling and extrapolation in post payment audits of Medicare claims), *cert. denied* 502 U.S. 1091 (1992); *see also Ill. Physicians Union v. Miller*, 675 F.2d 151, 155 (7th Cir. 1982) ("[E]xtrapolation based on  a review of a relatively small sample is a valid audit technique in cases arising under the Social Security Act").

The physician may appeal the determination, through a multi-level appeal process.  42 U.S.C. § 1395ff; 42 C.F.R. § 405.904(a)(2) (summarizing steps in appeal process:  redetermination; reconsideration; administrative law judge ("ALJ"); Medicare Appeals Council).   The Medicare statute requires full and early presentation of evidence:   absent good cause, an appellant may not introduce

---

[3]      CMS Rulings (previously known as HCFA Rulings, for the Health Care Financing Administration (HCFA), which was the earlier name of CMS) are formal policy statements that are binding upon all components that adjudicate matters under the jurisdiction of CMS.  *See* 42 C.F.R. § 405.1063(b).   CMS Ruling 86-1 is publicly available on the CMS website, at *www.cms.gov/Medicare/Appeals-and-Grievances/OrgMedFFSAppeals/Downloads/HCFAR861v508.pdf*

evidence later in the appeal process if the evidence was not presented at or before the reconsideration level.   42 U.S.C. § 1395ff(b)(3).   The assessment that the physician's payment error rate is high is, however, not subject to review.  42 U.S.C. § 1395ddd(f)(3); *Gentiva Healthcare Corp. v. Sebelius*, 723 F.3d 292, 297 (D.C. Cir. 2013); *Mansfield Ambulance, Inc. v. Dep't of Health & Human Servs.*, Case No. 16-CV-2016, 2017 WL 1953469, at *3 (N.D. Oh. May 10, 2017) (collecting cases).

### III.   Factual and procedural background

SafeGuard Services, LLC, a Medicare Zone Program Integrity Contractor ("SafeGuard Services" or "ZPIC") completed a post payment review of a sample of Plaintiff's Medicare claims, finding a high rate of error, and extrapolating from the sample to calculate a Medicare overpayment amount.

Plaintiff pursued an administrative appeal of this determination. Plaintiff first filed a request for redetermination.  On October 19, 2012, the appeals department at First Coast Service Options, a Medicare administrative contractor for Florida, issued a partially favorable Redetermination decision to Plaintiff, reversing the decisions on certain sampled claims in Plaintiff's favor.  AR 00441 – 00536.

Plaintiff appealed further. On February 15, 2013, $Q^2$ Administrators, a Qualified Independent Contractor ("QIC"), issued a partially favorable decision. AR 01130–01178.  The QIC reversed the decision on certain sampled claims in Plaintiff's favor.  *See* AR 01134.  The QIC reviewed the ZPIC's sampling and

extrapolation, AR 01163 – 01171, and upheld the sampling and extrapolation as complying with the applicable guidelines, AR 01170.

Plaintiff appealed further, to an ALJ. On June 30, 2016, the ALJ conducted a telephonic hearing. AR 00123.[4] On April 27, 2017, the ALJ issued a decision that was partially favorable to Plaintiff. AR 00122 – 00420. The ALJ invalidated the ZPIC's statistical sampling. AR 00249 – 00250.

On June 23, 2017, CMS referred the matter to the Medicare Appeals Council, requesting that the Council take 'own motion' review of the ALJ decision, on the ground that the ALJ had erred as a matter of law in certain respects. AR 00094 – 00120; *see* AR 00004. Plaintiff was notified of the referral, AR 00121, and submitted exceptions to the referral, AR 00047, AR 00079 – 00092. The Medicare Appeals Council took review, pursuant to its authority at 42 C.F.R. § 405.1110. *See* AR 00004 – 00005.

On September 20, 2017, the Medicare Appeals Council issued a decision. AR 0002-0046. The Council reversed the ALJ's determination invalidating the ZPIC's statistical sample. AR 00033. The Council found that nothing in the procedures utilized by the ZPIC failed to comport with the applicable Medicare guidelines. AR 00005, 00017. The Council determined that the sampling methodology and

---

[4]     The recording of the hearing is found in the AR on Disk 2.

extrapolation were appropriate.   AR 00033.   The Council also adopted in part, modified the part, and reversed in part the ALJ's decision with respect to certain individual services.   AR 00033.   The decision of the Medicare Appeals Council stands as the final agency decision of the Secretary of HHS.   *See* AR 00002.

## IV.   <u>Standard of review</u>

Plaintiff filed this civil action seeking judicial review of a final agency decision of the Secretary of HHS, rendered by the Medicare Appeals Council on September 20, 2017.   The jurisdictional basis for this civil action is 42 U.S.C. § 1395ff(b)(1)(A), which incorporates the Social Security Act's fundamental judicial review provision, 42 U.S.C. § 405(g).   *See* 42 U.S.C. § 1395ff(b)(1)(A) ("any individual dissatisfied  . . . shall be entitled to  . . . judicial review of the Secretary's final decision after such hearing as is provided in section 405(g) of this title."); *also see Am. Acad. of Dermatology v. Dep't of Health & Human Servs.*, 118 F.3d 1495, 1497–98 (11th Cir. 1997) ("Judicial review . . . is authorized by 42 U.S.C. § 1395ff(b)(1), which provides for judicial review . . . in the same manner as is provided in 42 U.S.C. § 405(g) . . .").   Under § 405(g),  a reviewing court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [agency], with or without remanding the cause for a rehearing."   The text of § 405(g) states, in pertinent part, that "[t]he findings of the [agency] as to any fact, if supported by substantial evidence, shall be

conclusive."  Accordingly, judicial review of the final agency decision is limited to a consideration of whether the record contains substantial evidence in support of the Secretary's findings and whether the correct legal standards were applied.  *Gulfcoast Med. Supply*, 468 F.3d at 1350 n.3 (citations omitted).  Section 405(g) provides for only a "limited" form of review.  *In re Bayou Shores SNF, LLC*, 828 F.3d 1297, 1325 (11th Cir. 2016), *cert. denied* - U.S. - , 137 S.Ct. 2214 (June 5, 2017).

Substantial evidence is more than a scintilla, but less than a preponderance. *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  Judicial review is to ascertain that there is "substantial evidence in the record taken as a whole."  *Fla. Med. Ctr. of Clearwater, Inc. v. Sebelius*, 614 F.3d 1276, 1280 (11th Cir. 2010) (citation omitted); *Gulfcoast Med. Supply*, 2005 WL 3934860 at *1 (citation omitted), *aff'd* 468 F.3d 1347.  In performing a review pursuant to § 405(g), the court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [agency decision-maker]."  *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983). "If the [administrative] decision is supported by substantial evidence [the court] must affirm, even if the proof preponderates against it."  *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996) (citing *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990)).  In addition to reviewing for substantial evidence, the court reviews the agency decision "to determine whether the correct legal standards were applied." *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997).

## V.   <u>Argument</u>

**A.    The final agency decision of the Secretary of HHS comports with the applicable legal standards and is supported by substantial evidence.   Accordingly, the Court should affirm the final agency decision.**

The matter before the Court is the final agency decision of the Secretary of HHS, which was issued by the Medicare Appeal Council on September 20, 2017. This decision is found at AR 00002 – 00046.   "The Court's review of an HHS final decision is very limited." *Maxmed Healthcare, Inc. v. Burwell*, 152 F. Supp. 3d 619, 624 (W.D. Tex. 2016), *aff'd Maxmed Healthcare, Inc. v. Price*, 860 F.3d 335 (5th Cir. 2017).   Plaintiff does not challenge the Medicare Appeals Council's denial determinations on individual claims in the Medicare sample.   Rather, Plaintiff challenges only the sampling and extrapolation.   The Medicare Appeals Council correctly determined that the sampling and extrapolation were consistent with the applicable guidelines for administrative Medicare post payment reviews.   *See* AR 00005 (" . . . [W]e find that the statistical sampling and overpayment extrapolation are consistent with the applicable manual guidelines, and that the appellant has not established that the statistical sampling is invalid.")   Under the applicable guidelines, and under the applicable standard of judicial review, the decision of the Medicare Appeals Council is due to be affirmed.[5]

---

[5]    Because it is the Council's decision, as the final agency decision that comes before the court for review, it is ultimately immaterial that the QIC upheld the ZPIC's sampling and

The Medicare guidelines allow a "great deal of latitude" in sampling design, and there is a "presumption in favor of the sampling's validity." *Momentum EMS, Inc. v. Sebelius*, Civ. A. No. 4:11-CV-298, 2014 WL 199061 at *10 (S.D. Tex. Jan. 13, 2014); AR 00012 (Council notes that "[t]he MPIM recognizes that a number of sampling designs are acceptable").   As a threshold consideration, there is "no discrete body of generally accepted statistical standards at which to look as establishing minimum standards . . . [or] authority for the proposition that they [generally accepted statistical principles] establish an enforceable due process standard."   *Pruchniewski v. Leavitt*, No. 8:04-CV-2200-T-23TBM, 2006 WL 2331071, at *9 (M.D. Fla. Aug. 10, 2006). "Sample adjudication . . . is a monetized estimate of the scope of a provider's overcharges derived from a sample." *Chaves County Home Health Servs.*, 931 F.2d at 921. To establish that the Secretary erred in upholding a ZPIC's sampling methodology, an appellant would have to do more

---

extrapolation, *see* AR 01163–01171, or that the ALJ invalidated them, *see* AR 00249–00250. There have indeed been numerous instances in which an ALJ has invalidated a ZPIC's sampling, and the Medicare Appeals Council has then subsequently reversed the ALJ on that score. *See*, e.g., *John Balko & Assocs. v. Sebelius*, No. 12cv0572, 2012 WL 6738246 (W.D. Penn. Dec. 28, 2012), *aff'd* 555 F. App'x. 188 (3rd Cir. 2014) (affirming Council's decision); *San Bois Health Servs., Inc. v. Hargan,* No. CIV-14-560, 2017 WL 5140519 (E.D. Okla. Nov. 6, 2017) (same); *Chillicothe Chiropractic & Wellness Ctr.*, No. 2:12-CV-330, 2014 WL 6673826 (S.D. Oh. Nov. 24, 2014) (same); *Becker v. Sebelius*, Civil Action No. 12–6177 (CCC), 2014 WL 2711958 (D.N.J. June 3, 2014) (same); *Schuldt Chiropractic Wellness Ctr.*, No. 8:13CV4, 2014 WL 247972 (D. Neb. Jan. 22, 2014) (same); *Miniet v. Sebelius*, No. 10-24127-CIV, 2012 WL 2930746 (S.D. Fla. July 18, 2012) (same); *Transyd Enterprs. v. Sebelius*, Civ. A. No. M-09-292, 2012 WL 1067561 (S.D. Tex. Mar. 27, 2012) (same); *Maxxim Care ERS, Inc. v. Sebelius*, Civ. A. No. H-10-1408, 2011 WL 5977666 (S.D. Tex. Nov. 29, 2011) (same).

than simply "cit[e] to a variety of professional opinions on acceptability, but rather, the appellant must "establish [that] the degree of imprecision is such that the extrapolation does not reasonably approach the actual overpayment, that is, [that] it is so imprecise as to be arbitrary and capricious." *Pruchniewski*, 2006 WL 2331071, at *15. In other words, this is a practical enterprise, and not a merely speculative one.

The presumption is that a ZPIC's sampling and extrapolation have been conducted adequately. The courts have long recognized that there are, however, ways by which a Medicare appellant might seek to show a ZPIC's sampling and extrapolation to be problematic. For instance, the appellant might attempt to present "evidence of a different random sample from the universe of claims that yield[ed] a lower rate of denials or [that] prove[d] that the projection [was] not a true estimate of the rate of denials in the non-sample universe." *See Chaves County Home Health Servs.*, 931 F.2d at 921. The appellant might attempt to establish the validity of all or a sufficient number of actual claims such that the Medicare contractor might find an error rate that is sufficiently low that the contractor would not project and extrapolate. *Id.* "[N]othing prevent[s] [an appellant] from . . . demonstrating through his own, more reliable, sampling method an estimated overpayment that [i]s less than the lower limit of the 90% confidence interval calculated by the [Medicare contractor]." *Pruchniewski*, 2006 WL 2331071, at *15 n.20; *see Schuldt*

*Chiropractic Wellness Ctr.*, No. 8:13CV4, 2014 WL 247972, at *4 (D. Neb. Jan. 22, 2014) (noting provider's failure to present "evidence of a different random sample" that would have materially affected the outcome); *United States v. Arrow Med. Equip. Co.*, Civ. A. No. 90-5701, 1991 WL 193447, at *5 (E.D. Pa. Sept. 23, 1991) (noting provider's failure to "construct a counter-sample" and demonstrate that its results are "more accurate" than the Medicare program's results).

The applicable guidelines for the use of sampling and extrapolation are found in the Medicare Program Integrity Manual, CMS Publication No.100-08 ("MPIM").[6] At the time of the Medicare Appeals Council's decision, the guidelines for sampling and extrapolation were found at Chapter 3 of the MPIM. *See* AR 00010. Since that time, the guidelines have been relocated to Chapter 8 of the MPIM. *See id.* The MPIM guidelines are important, but a failure to follow one or more of those guidelines does not necessarily affect the validity of the sampling or extrapolation. *Maxmed Healthcare*, 860 F.3d at 341; MPIM, Chapter 3, § 3.10.1.1

---

[6]     The Medicare manuals are an extensive system of guidance materials, the importance of which have been well-recognized by the courts. *See*, e.g., *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 101 (1995) (Medicare manuals advise as to how the Secretary "will apply the Medicare statute and regulations . . ."); *Cmty. Care, LLC v. Leavitt*, 537 F.3d 546, 547 n.2 (5th Cir. 2008) (Medicare manuals contain guidelines "to assist providers and [Medicare contractors] in the implementation of the Medicare regulations") (citation omitted); *Shalala v. St. Paul-Ramsey Med. Ctr.*, 50 F.3d 522, 524 (8th Cir. 1995) ("The Secretary has issued a number of guidelines and manuals, to assist interested parties in navigating the shoals of the Medicare . . . system.").

The MPIM, along with other Medicare manuals, is publicly available on the CMS website, at *www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/*.

(currently found at MPIM, Chapter 8, § 4.1.1); AR 00011. The MPIM guidelines reference a number of statistical sampling texts as source materials. *See* MPIM, Chapter 8, § 8.4.10 ("Resources"). In the decision under review in the instant matter, the Medicare Appeals Council included an apt summary of the key principles articulated in the MPIM. *See* AR 00010 – 00014.

The MPIM recognizes a number of sampling designs as acceptable designs, including stratified sampling, as well as simple random sampling, systematic sampling, cluster sampling, or a combination thereof. MPIM, Chapter 3, § 3.10.4.1 (currently found at MPIM, Chapter 8, §§ 8.4.4.1 *et seq.*); *see* AR 00012. The ZPIC is not required to use the most precise methodology that might be devised in order to determine an estimated overpayment. Rather, the MPIM guidelines take account of a level of uncertainty. The guidelines do this in a manner that ensures fairness to the physician and indeed, that operates to the advantage of the physician. As the Medicare Appeals Council wrote:

> . . . [T]he [Medicare] guidelines allow for smaller sample sizes and less precise point estimates, but offset such lack of precision with direction to the [contractors] to assess the overpayment at the lower level of a confidence interval – generally, the lower level of a ninety percent one-sided confidence interval. This results in the assumption, in statistical terms, that there is a ninety percent chance that the actual overpayment is higher than the overpayment which is being assessed, thus giving the benefit of the doubt resulting from any imprecision in the estimate of the overpayment to the appellant, not the agency.

AR 00010, AR 0013 (citing MPIM, Chapter 3, § 3.10.5.1) (currently found at MPIM,

Chapter 8, § 8.4.5.1); *see Schuldt Chiropractic Wellness Ctr.*, No. 8:13CV4, 2014 WL 247972, at *3 (D. Neb. Jan. 22, 2014) (noting that "the [MPIM] allows for smaller statistical samples with less precise results, offset by the direction that overpayments be assessed at the lower level of confidence intervals, giving the benefit of the doubt regarding the range of overpayment to the [M]edicare provider"). This is a policy choice made by CMS in order to ensure fairness.

In the instant matter, the ZPIC utilized a stratified sampling methodology. *See* AR 00015.[7] As the Medicare Appeals Council recognized, AR 00015 – 00016, the ZPIC duly described its sampling.[8]

On its Sample Verification and Approval sheet, the ZPIC described the universe and defined the frame. The ZPIC identified the Sampling Unit as the Beneficiary (or patient). The ZPIC described the Sample Design as "Stratified sampling, with 5 strat[a] using equal allocation." The ZPIC specified that "The universe is sorted by dollars in ascending order then approximately one fifth of the

---

[7]     Specifically, the ZPIC used a design known as disproportionate stratified sampling. *See* AR 00018. For additional discussion of the use of disproportionate stratified sampling, *see, for example*, *In the Case of Robert D. Lesser, M.D.*, Docket No. M-11-2534, 2011 WL 7177074, at **10-11 (Medicare Appeals Council Dec. 7, 2011).

[8]     The pertinent materials are housed on Disk 3 of the Administrative Record (under the heading "MH"). These materials include, *inter alia*: the Sample Verification and Approval sheet in which the ZPIC statisticians describe the sample design; the Extrapolation Worksheet; the Overpayment Worksheet (in the form of a lengthy EXCEL spreadsheet); and the Overpayment Projection sheet. *See* AR 00015 n.1 (pointing to the materials in the "MH" folder).

total dollars paid is partitioned into the 5 strat[a].  Simple random sampling is

performed within each stratum."   The ZPIC specified the sample selection

procedures as employed within each stratum.   The ZPIC's Extrapolation Worksheet

included the Overpayment Detail and Overpayment Summary, by stratum, plus a

total overpayment amount as calculated at the lower bound of a one-sided 90%

Confidence Interval").

The Medicare Appeals Council described the ZPIC's procedures in some

detail:

> The frame of 1,316 beneficiaries was arranged from the smallest total
> dollar amount paid for a beneficiary's claims to the largest total amount
> paid for a beneficiary's claims for the time period at issue.  The total
> Medicare payment on these 1,316 beneficiar[ies]' claims was
> $1,291,869.67.  The frame beneficiaries were then assigned to one of five
> strata.  The total amount of $1,291,869.67 was divided by five, and each
> stratum from 1 [to] 5 was assigned a number of consecutive beneficiaries
> from the frame such that the total dollar amount paid for all beneficiaries
> assigned to each stratum was approximately equal [among] the five strata.
> . . . The ZPIC then randomly selected ten beneficiaries from each stratum
> for a total sample size of fifty beneficiaries.  The sampling documentation
> indicates the formula the ZPIC used in determining appropriate sample size
> . . . Following selection and review of the fifty sampled claims, the ZPIC
> calculated the mean overpayment for the ten sampled claims within each
> stratum and extrapolated the results of the ten beneficiaries' mean
> overpayments in each stratum to all other beneficiaries *in that stratum* . . .
> [t]he mean overpayment in each stratum was "weighted" by the number of
> beneficiaries in  each stratum before calculating the total overpayment
> estimate . . . Per the Medicare guidelines, the ZPIC then reduced the
> overpayment to the lower bound of a 90% one-side Confidence Interval.

AR 00015–00016.  The "weighting" process described by the Council is recognized

expressly in the MPIM.  *See* MPIM, Chapter 8, § 8.4.5.1 ("In stratified sampling, an

estimate is found for each stratum separately, and the weighted stratum estimates are added together to produce an overall point estimate," i.e., the difference between what was paid to the physician and what should have been paid).  After its detailed recounting of the ZPIC's steps, AR 00015 – 00017, the Medicare Appeals Council then aptly summarized the steps that had been taken and duly documented:

> . . . [T]he ZPIC reasonably defined the universe and sampling unit[;] organized the frame by total paid amounts per beneficiary[;] stratified the frames' beneficiaries into five strata by total dollar amounts paid per beneficiary[;] selected ten claims by random seed number selection from each stratum[;] weighted the mean overpayments in each stratum before adding them together to determine the point estimate [;] and then reduced the overpayment  assessment to the lower limit of a one-sided 90% confidence interval.

AR 00017.  As the Council correctly recognized, "There is nothing about this process that is in violation of the processes set out in the sampling guidelines" in the MPIM, in any way.  AR 00017.

Plaintiff writes at some length, but fails to identify anything in the Council's decision that remotely constitutes error.  Plaintiff complains that the Medicare Appeals Council did not accept the contention of Plaintiff's statistician that the ZPIC's sampling unit should have been the "principle [sic] diagnoses" on the claims that were billed.  *See* ECF No. 16 at 28.  The Council remarked frankly that it had "rarely, if ever, reviewed a sampling methodology based on, or stratified by, a beneficiary's principle [sic] diagnosis."  AR 00017.  As the Council cited, the MPIM describes "[s]ampling units" as "the elements that are selected according to the

design of the survey and the chosen method of statistical sampling.  [The sampling units] may be an individual line(s) within claims, individual claims, or clusters of claims (e.g., a beneficiary).  AR 00014; MPIM, Chapter 3, § 3.10.3.2.2. (currently found at MPIM, Chapter 8, § 8.4.3.2.2).  "In principle, any type of sampling unit is permissible as long as the total aggregate of such units covers the population of potential mis-paid amounts."  MPIM, Chapter 8, § 8.4.3.2.2.  The MPIM guidelines contain no reference at all to the use of 'principle diagnosis' as a potential sampling unit, let alone prescribe it as necessary.

Plaintiff complains that the Medicare Appeals Council erred in declining to invalidate the sampling on the ground that the "stratified average overpayment in the sample as drawn and conducted were not normally distributed" and hence flawed, as Plaintiff's statistician Harold Haller had opined.  *See* ECF No. 16 at 28 – 29.  This same statistician has opined similarly about normal distribution in other recent Medicare appeals, and the Medicare Appeals Council has consistently rejected the contention.  *See*, e.g., *Maxmed Healthcare*, 152 F.Supp.3d at 636 - 37, 634, *aff'd* 860 F.3d 335; *In the Case of Anthony Pagliarulo, M.D,* Docket M-14-2132, 2014 WL 7436077, at *16 (Medicare Appeals Council, Sept. 26, 2014).  In its decision in the instant matter, the Medicare Appeals Council observed plainly that "Medicare sampled units . . . generally do *not* follow a normal distribution . . ."  AR 00020 (emphasis in original).  By reference to the evidence of record, the Council indicated

it would not "expect to see normal distribution in a sample where there are such largely varying individual payment amounts among the frame's beneficiaries . . ." AR 00020.  The Council reiterated the significance of confidence level estimation in cases of this nature, AR 00020, as "a conservative method" that offsets any imprecision in a manner "that works to the financial advantage of the [physician]," AR 00013.

Plaintiff complains that the ZPIC did not provide substantive testimony at the ALJ hearing.  ECF No. 16 at 36; *see* AR 00250 (noting unavailability of ZPIC's Chief Statistician, who had designed sampling).  This is not highly unusual.  *See, e.g, Schuldt Chiropractic Wellness Ctr.*, 2014 WL 247972, at *1 (reciting without further comment that "[n]o representative, agent, or witness appeared on behalf of HHS" at hearing).  The regulations that govern the Medicare appeals process expressly direct that no adverse inference may be drawn when CMS or a ZPIC does not participate in an appeal.  42 C.F.R. §§ 405.1010(f), 405.1012(d).[9]  As discussed above, Plaintiff's statistician raised no point that suggested that the ZPIC had deviated in any way from the MPIM guidelines.  In any event, the ZPIC had previously submitted to the ALJ a detailed report prepared by its Chief Statistician,

---

[9]      Indeed, an ALJ hearing need not even occur:  If a physician has to wait more than 90 days, the Medicare statute permits an appellant to escalate his appeal past the ALJ level to the Medicare Appeals Council.  42 U.S.C. § 1395ff(d)(3)(A).

in response to contentions raised by the statistician (Dr. Bruce Kardon) whom Plaintiff had retained earlier.  AR 04343–04351 (report of Alina Moya, Chief Statistician with SafeGuard Services, submitted June 5, 2014); *see* AR 04342 – 04378 (Kardon report).[10]

Plaintiff makes a nod to the notion that "results" matter.  *See generally* ECF No. 16 at 29.  But Plaintiff misses the real point.  The use of sampling and extrapolation in the Medicare administrative review process is a practical application undertaken for a practical purpose.  Here, Plaintiff did nothing to show that a different sampling design would have or could have yielded materially different results.  Despite longstanding advisements by reviewing courts, Plaintiff did not endeavor to present "evidence of a different random sample from the universe of claims that yield[ed] a lower rate of denials or prove[d] that the projection [was] not a true estimate of the rate of denials in the non-sample universe." *See Chaves County Home Health Servs.*, 931 F.2d at 921.  Although "nothing [would have] prevented [Plaintiff] from  . . . demonstrating through his own, more reliable, sampling method an estimated overpayment that [i]s less than the lower limit of the 90% confidence interval calculated by the [Medicare contractor]," *see Pruchniewski*, 2006 WL 2331071, at *15 n.20, Plaintiff did not endeavor to do so.  Plaintiff did not "construct

---

[10]     Over the course of the appeal process, Plaintiff chose to change both his counsel and his statistician.

a counter-sample" in an effort to demonstrate that it could yield results that were "more accurate" than the ZPIC's results. *See Arrow Med. Equip.*, 1991 WL 193447, at \*5. Plaintiff did not present "evidence of a different random sample," *see Schuldt Chiropractic Wellness Ctr.*, 2014 WL 247972, at \*4, in an effort to show that a different sample would materially affect the outcome (the overpayment). In sum, Plaintiff made no attempt to show that any different or more precise method of estimation and extrapolation would have resulted in a lower overpayment.[11]

The Medicare Appeals Council's decision comported fully with the applicable Medicare program guidelines, as chiefly contained in the MPIM. The Council's decision was supported by "substantial evidence in the record taken as a whole," *see Fla. Med. Ctr. of Clearwater*, 614 F.3d at 1280; *Gulfcoast Med. Supply*, 2005 WL 3934860 at \*1, *aff'd* 468 F.3d 1347, including, *inter alia*, the ZPIC's Sample Verification and Approval sheet, Extrapolation Worksheet, and Overpayment Worksheet. The Council properly found that Plaintiff's Medicare overpayment was determined in a manner entirely consistent with the Medicare program's principles and guidelines.[12]

---

[11] Indeed, Plaintiff's statistician Haller acknowledged that he had "made no attempt to suggest or recommend improved, alternative, or more precise methods of estimate and extrapolation." AR 00078.

[12] The Council did note that the overpayment amount would need to be recalculated in order to take account of those individual claims in the sample that got reversed in Plaintiff's favor (upon review of the medical evidence supporting the claims) over the course of the appeal process. AR 00021.

## <u>Conclusion</u>

The final agency decision of Defendant Secretary of HHS is supported by substantial evidence and comports with the applicable legal standards.  Accordingly, Defendant respectfully submits that the final agency decision should be affirmed and judgment should be entered in Defendant's favor.

<div style="margin-left: 40%;">

Respectfully submitted,

CHRISTOPHER P. CANOVA
United States Attorney

<u>*/s/ Zack Smith*</u>
Zack Smith
Assistant United States Attorney
Florida Bar No. 107218
21 E. Garden Street, Suite 400
Pensacola, FL  32502
(850) 444-4000
zack.smith@usdoj.gov

</div>

## **LOCAL RULE 7.1(F) CERTIFICATE**

I certify that this paper contains 5,218 words, per Microsoft Word's word count, which complies with the word limit requirements set forth in Local Rule 7.1(F).

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a copy of the foregoing has been furnished by via CM/ECF filing to the Clerk of Court which will send notification of such filing to the parties of record on this 1st day of November, 2018.

/s/ Zack Smith
ZACK SMITH
Assistant U.S. Attorney