# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### Panama City Division

| | | |
|---|---|---|
| Mustafa A. HAMMAD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **CASE NO. 5:17-cv-00288-RH-GRJ** |
| | ) | |
| Alex M. AZAR II, | ) | |
| in his capacity as Secretary of | ) | |
| the United States Department | ) | |
| of Health and Human Services, | ) | |
| | ) | |
| Defendant. | ) | |
| _____/ | | |

**PLAINTIFF'S MOTION FOR JUDGMENT ON THE PLEADINGS
PURSUANT TO RULE 12(C) AND/OR FOR SUMMARY JUDGMENT
PURSUANT TO RULE 56 OF THE FEDERAL RULES OF CIVIL
PROCEDURE AND INCORPORATED MEMORANDUM OF LAW**

Sean M. Ellsworth, Esq.
Florida Bar No. 39845
Ellsworth Law Firm, P.A.
420 Lincoln Road, Suite 601
Miami Beach, Florida 33139
(305) 535-2529 (phone)
(305) 535-2881 (fax)
sean@ellslaw.com

Christopher A. Parrella, J.D., CHC, CPC
2333 Brickell Avenue, Suite A-1
Miami, Florida 33129
(admitted *pro hac vice*)

*Attorneys for Plaintiff*

## MOTION

Dr. Mustafa A. Hammad is medical doctor licensed in the State of Florida since 2005, who, during the relevant time, was certified by the American Boards of Internal Medicine, Interventional Pain Physicians, Clinical Neurophysiology, Sleep Medicine and Psychiatry and Neurology.  Dr. Hammad provides services to Medicare beneficiaries – often to the most difficult cases after other physicians have failed – and is reimbursed under the Medicare program.

In June 2009, a Medicare contractor conducted a post-payment audit of Dr. Hammad related to services he provided between January 1, 2006 and December 31, 2008.  The Zone Program Integrity Contractor ("ZPIC") SafeGuard Services, Inc. ("SafeGuard") reviewed patient files for 50 of Dr. Hammad's patients, comprising 811 claims for 1215 services. SafeGuard, which had a significant financial interest in finding an overpayment, determined all the claims for all the services were paid in error. Then, SafeGuard "extrapolated" its conclusion of 100% overpayment to all 1316 patients for whom Dr. Hammad had provided services paid for by Medicare, and demanded Dr. Hammad repay over $1.2 million.

Dr. Hammad has consistently maintained that all the services provided to the 50 beneficiaries were medically necessary and properly reimbursed.  His challenges to SafeGuard's ruling through a redetermination request and

reconsideration before the Qualified Independent Contractor resulted in reversal of more that 40 percent of SafeGuard's coverage determinations.  After a hearing before an administrative law judge ("ALJ"), an overwhelming majority of SafeGuard's coverage determinations were reversed, and SafeGuard's extrapolation methodology was invalidated based on the detailed and unrefuted evidence of Dr. Hammad's statistical expert. Consequently, Dr. Hammad's overpayment assessment was limited to only those relatively few claims actually determined to be not covered.

On own-motion review the Medicare Appeals Council ("MAC") reversed the ALJ's decision invalidating SafeGuard's sampling and extrapolation methodology, and Dr. Hammad sought judicial review in this Court.

The government has indicated in its Answer that this case should be decided by dispositive motions.  Plaintiff agrees. This Court has indicated the parties need not follow the specific motion practice for Rule 12(c) (judgment on the pleadings) or Rule 56 (summary judgment) of the Federal Rules of Civil Procedure.

As discussed in the incorporated Memorandum of Law, the MAC's decision must be reversed because it is based on errors of law and factual findings not supported by substantial evidence.  Most specifically, the MAC's decision that CMS and its contractors need not follow the laws and assumptions of statistical theory is an error of law, and in violation of constitutional due process, Congress's

clear statutory text, and CMS rules, regulations, and guidance.  Further, here uncontroverted evidence establishes that application of statistical law and theory to the facts of this case require invalidating the extrapolated overpayment assessment against Dr. Hammad, thus the MAC either erroneously applied the law to the facts of this case or made findings of fact not supported by substantial evidence.

For these reasons and those discussed in the incorporated memorandum, Dr. Hammad moves this honorable Court for an Order reversing the MAC's decision upholding SafeGuard's extrapolation.

## MEMORANDUM OF LAW

## FACTUAL AND PROCEDURAL BACKGROUND

In June 2009, SafeGuard conducted an announced on-site review of Dr. Hammad's offices.  R. 01369.  During that visit, SafeGuard requested Dr. Hammad provide medical records for 50 individual Medicare beneficiaries treated by Dr. Hammad between May 2007 and December 2008. R. 01369-70.  In June and July 2009, Dr. Hammad provided the requested records for the 50 individual beneficiaries, involving 811 Medicare claims for 1215 services. R. 01370.

Three years later, on June 29, 2012, Dr. Hammad was informed by letter that SafeGuard had concluded that 100 percent of the 811 claims for all 1215 services for the 50 selected beneficiaries were paid in error (resulting in $122,869.89 in claimed overpayments for the 50 selected beneficiaries), and that it had extrapolated its results to the entire universe of claims for the three year period running from January 1, 2006 through December 31, 2008 (comprising 1316 beneficiaries), resulting in an asserted overpayment of $1,203,244.00. R. 01369-70, 00552-53. On July 25, 2012, the Medicare Administrative Contractor, First Coast Service Options, Inc. ("FCSO"), demanded repayment of $1,203,244.00. R. 00560.

Dr. Hammad disagreed with SafeGuard's determinations, asserted each of the services provided to the 50 beneficiaries was medically necessary and properly

reimbursed, and requested reconsideration of SafeGuard's determinations. R. 00556.  On redetermination, FCSO issued a partially favorable ruling, allowing coverage on many claims previously rejected by SafeGuard. R. 00542-45, 00441-536.

In December 2012, Dr. Hammad, continuing to maintain the propriety of the services he provided and the Medicare reimbursements, requested reconsideration by the Qualified Independent Contractor ("QIC") of the unfavorable portions of the redetermination decision, and provided additional records for support.  *See* R. 00700.  Dr. Hammad also challenged the extrapolation based on FCSO's failure to provide requisite documentation to support the sampling and extrapolation methodology. R. 01350-72.

On February 15, 2013, the QIC, Q2 Administrators, LLC, ("Q2A") issued a partially favorable determination, allowing coverage for many additional claims. R. 01268-1348.  At this point, almost half of the claims initially deemed improper by SafeGuard had been found to be proper and compensable by Medicare. R. 01130-78. The QIC, without affording Dr. Hammad an opportunity to analyze or challenge the methodology, concluded the statistical sampling and extrapolation was permissible. R. 01166-71.

On April 10, 2013, Dr. Hammad requested review before an Administrative Law Judge ("ALJ"), (1) challenging all the unfavorable claims determinations, and

(2) asserting "that the statistical sampling and extrapolation performed by the

Medicare Administrative Contractor was flawed and does not correctly reflect the

amount of overpayment, if any."  R. 01123.

Prior to the June 30, 2016, administrative hearing, Dr. Hammad submitted

the report of statistical expert Harold Haller.  In his report, Dr. Haller – an

Accredited Professional Statistician who holds a Ph.D in mathematics and statistics

and had, at that time, been retained approximately 70 times by ALJs as an

independent expert in healthcare cases, R. 02522 – explained that in order to

employ statistical sampling to project (extrapolate) an overpayment assessment,

CMS and its contractors must draw a statistically valid random sample and must

employ statistically valid methods for sampling and extrapolation, which in turn,

requires following the "laws and assumptions of probability and statistical theory."

R. 02523-25.  Dr. Haller explained that he performed statistical tests that

established that (1) the sample as drawn was not representative of the universe or

frame along several important criteria, R. 02526, and (2) SafeGuard "used the

wrong formula for estimation and extrapolation from the sample to the frame,"

because at least one key prerequisite was lacking for use of the SafeGuard's

extrapolation formula to determine the one-sided 90% confidence limit.  R. 02526-

27; R. 02529.  As to this latter point, Dr. Haller explained that in order to be used

for confidence limit calculations, SafeGuard's extrapolation formula requires "the

distribution of the <u>stratified</u> <u>average</u> overpayments in the sample to be normal or bell shaped," and that here application of the Shapiro-Wilk W test demonstrated that there was less than a 0.01% chance this requirement was met, meaning SafeGuard's extrapolation calculation was improper in this case.  R 02529. Specifically, Dr. Haller explained that SafeGuard's assertion that it assessed an extrapolated overpayment that had a 90 percent chance of being lower than the actual overpayment was not supported by SafeGuard's extrapolation calculations, and "<u>SGS cannot be 90% confident that their demand amount is less than the total overpayment to the frame</u>. . . . <u>The extrapolation is invalid</u>."  R. 02530 (showing test results and concluding: "Based on the statistical tests shown above, the <u>stratified sample average overpayments are not normally distributed</u> . . . . Thus, [SafeGuard] used incorrect formulas for estimation and extrapolation in the audit of Hammad.  <u>For this reason alone the extrapolation is invalid</u>.") (all emphasis in original).

Dr. Haller testified along similar lines at the ALJ hearing. The SafeGuard statistician who "implemented the sampling in this case" did not testify at the ALJ hearing, nor did she respond to Dr. Haller's expert report.  *See* R. 00020-21 (MAC recognizing this fact); R. 00249-50 (ALJ stating: "Ms. Moya never appeared at the scheduled hearing and did not provide a sufficient argument as to why her sampling and extrapolation findings were valid in order to rebut the findings of Dr.

Haller. Ms. Alina Moya was the sole statistician who created the statistical

methodology and extrapolation for Safeguard [sic] Services.  She was 'on

vacation' and unavailable during the ALJ hearing."). A SafeGuard statistician

named Noel McKetty did testify; however, he failed to provide any detailed

analysis or testimony, failed to refute Dr. Haller's statistical conclusions and test

results with any specificity, and relied instead on conclusory and unsupported

statements asserting the propriety of SafeGuard's statistical sampling and

extrapolation.  R. 00224 (ALJ Decision describing Mr. McKetty's testimony); R.

File "Dr. Hammand [sic] 1-1473648165 Part 1A 6-3016 [sic] Hearing.MP3"

("Hearing Recording") at 00:51:15-1:01:58 and 1:10:04-1:16:45.

At the hearing, Mr. McKetty testified that he and Ms. Moya would like to

prepare a written response to Dr. Haller's expert statistical report.  Hearing

Recording at 1:15:50-1:16:15.  Neither SafeGuard, CMS, nor any other contractor

ever introduced any such refutation of Dr. Haller's expert statistical report and

testimony into this case or made any such report part of the record.  Nor did they

submit a response to Dr. Haller's refutation of the CMS referral memorandum.  R.

00020-21.

On April 27, 2017, ALJ Richard S. Bush issued a partially favorable

decision.  The ALJ overruled the vast majority of the Medicare contractors'

unfavorable coverage decisions, R. 00250-418, and rejected the extrapolated

demand for overpayment finding the statistical sampling and extrapolation calculations were invalid, R. 00249-50.  While the exact reimbursement of some (13) of the claims could not be determined at the time of the 2016 hearing, the ALJ, based on expert testimony, estimated Dr. Hammad's total liability for individually adjudicated claims was approximately $15,500.00.  R. 00418.

On June 23, 2017, CMS submitted a referral memorandum requesting MAC own-motion review.  R. 00049-76.  As relevant here, CMS claimed the ALJ "erred as a matter of law in finding the 'ZPIC's sampling was invalid' based on" Dr. Haller's expert declaration and hearing testimony, because "[t]he standards Dr. [Haller] attempts to impose are inconsistent with the sampling requirements in Ruling 86-1 and the *MPIM*."  R. 00065.  CMS's chief complaint with Dr. Haller's expert analysis is not that it was refuted before the ALJ or that it is incorrect. Instead, CMS urged that the statistical texts upon which Dr. Haller relies, while referenced in the MPIM, are not incorporated into CMS sampling requirements, and thus, the CMS contractors' failure to recognize and properly apply the formulas in those texts is irrelevant to this case.   R. 00066.

Unable to refute Dr. Haller's assertion that "I have proved the stratified average overpayment is not normally distributed," thus SafeGuard's confidence interval calculation for extrapolation is invalid, CMS attempts to avoid its devastating import by asserting the ZPIC has no burden "to prove that the amount

requested is less than the actual overpayment." R. 00067.  Then, ignoring the

logical inconsistency, CMS goes on to argue that problems with the small sample

size and imprecision in sampling methodology should be overlooked because the

contractor "assess[ed] the overpayment at the lower limit of a one-sided 90 percent

confidence interval."  R. 00067 (citing MPIM § 8.4.2).  Of course, Dr. Haller's

entire point was that by attempting to calculate the lower limit of a one-sided 90

percent confidence interval when the prerequisites for SafeGuard's chosen

estimation formula were not met, SafeGuard relied on an incorrect formula and

failed to reliably an calculate the one-sided 90 percent confidence interval.  *See,*

*e.g.,* R. 00084, 00087.

On June 30, 2017, Dr. Hammad filed Dr. Haller's response to the own-

motion referral memorandum detailing its errors, and reiterating conclusions from

his prior expert report and testimony.  R. 00078-92.

On September 20, 2017, the Medicare Appeals Council issued its decision

on "own-motion" review. Most basically, for present purposes, the MAC

concluded "that the statistical sampling and overpayment extrapolation are

consistent with the applicable manual guidelines, and that the appellant has not

established that the statistical sampling is invalid."  R. 00005.

The MAC explained that Dr. Hammad argued – and the ALJ agreed – that

(1) the sample of beneficiaries selected by SafeGuard was biased, and (2) the

extrapolation to the larger universe of beneficiaries (the frame) was invalid.  *See* R. 00006. Specifically, the MAC explained that Dr. Hammad's statistical expert testified that he had proven by statistical testing that SafeGuard's sample was not representative of the frame with regard to four characteristics, and thus "the sample was biased and was not a statistically valid random sample."  R. 00006.

The MAC explained further that Dr. Hammad's expert also testified that the extrapolation was invalid because the sample as drawn by SafeGuard failed to meet the prerequisites for confidence interval calculation, principally because "the stratified average overpayment(s) were not normally distributed," and SafeGuard's unstated reliance on the Central Limit Theorem ("CLT") was improper and in violation of established statistical methods.

The MAC explained that CMS's chief argument in its referral memorandum was "that the ALJ erred as a matter of law by invalidating the ZPIC's [SafeGuard's] sampling."  R. 00007.  With regard to the finding the sampling was invalid, the MAC explained: "CMS argues before the Council that the ALJ erred as a matter of law by invalidating the ZPIC's statistical sampling because he imposed requirements that are inconsistent with Medicare authorities.  Exh. MAC-1 at 16. Specifically, CMS challenges the appellant's (and, therefore, the ALJ's) reliance on statistical texts and argues that, while the Medicare Program Integrity Manual (MPIM), CMA Pub. 100-08, Chapter 8 'lists several sampling resources, it does

not incorporate the "theoretical details" of those texts into CMS sampling requirements.' *Id.* at 17." R. 00008.  In other words, CMS argued – and the MAC agreed – that, as a matter of law, CMS need not use, follow, or comply with prevailing and authoritative statistical methods textbooks or prevailing academic and professional statistical guidelines and norms.

The MAC also explained the rebuttal to the referral memorandum submitted by Dr. Hammad's statistical expert, Dr. Haller.  As he did before the ALJ, Dr. Haller explained to the MAC (1) that SafeGuard "did not follow the laws and assumptions of probability and statistics," (2) that statistical testing demonstrated that SafeGuard's sample was biased as to (a) the amounts paid per beneficiary, (b) the number of claims per beneficiary, (c) the principal diagnoses of the beneficiaries, and (d) the procedure codes billed, thus the sample was "not statistically valid," and (3) that statistical "testing demonstrated that the distribution of the stratified average overpayments was not normal, and therefore, [SafeGuard] used incorrect formulas for estimation and extrapolation," in violation of accepted statistical principles and MPIM rules for statistical sampling.  R. 00009.

Despite the completely complete lack of record evidence in support of the CMS position, the MAC reversed the ALJ decision invalidating SafeGuard's sampling and extrapolation methodology and reinstated SafeGuard's extrapolation.

The MAC decision addresses the ALJ's order with respect to individual coverage determinations challenged by CMS involving four individual beneficiaries, disallowing claims for eight services, allowing claims for four others, and downgrading the claim for one service.  R. 00021-33.

The record does not reflect a calculation of the actual overpayment assessment based on the five tiers of review of the claims submitted for the 50 beneficiaries in the "sample."  Undersigned counsel estimates that the actual overpayment amount based on the 50 sample beneficiaries post MAC-order stands below $17,000.  In any case, there can be no doubt the alleged overpayment is nowhere near the $122,869.89 initially assessed by SafeGuard, and instead is much closer to the $15,500 estimate noted by the ALJ.  *See* R. 00418.  As such, it appears over 85% of the dollar amount of paid claims initially determined by SafeGuard to be disallowed, has been determined to be allowed and reimbursable upon redetermination by the Medicare Administrative Contractor, reconsideration by the QIC, review after hearing by the ALJ, and own-motion review by the MAC. Said otherwise, the Medicare Administrative Contractor, the QIC, the ALJ, and the MAC together have concluded that in this case, SafeGuard's coverage determinations as to amount overpaid were overwhelmingly wrong.

Nevertheless, overlooking this reprehensible error rate on coverage decisions, the MAC accepted SafeGuard's statistical sampling and extrapolation

calculations and reversed the ALJ's decision invalidating the extrapolation upon which SafeGuard turned its supposed (and since thoroughly debunked) $122,869.89 actual overpayment assessment into a demand for more than $1.2 million from Dr. Hammad.

In considering the MAC's reasoning in support of SafeGuard's extrapolation calculations, discussed in detail below, this Court might consider the Fifth Circuit's admonition last year: "Think about the potential problems with extrapolation methodologies employed by private contractors who are awarded bounties for finding purported overpayments and whose findings are presumed valid." *Maxmed Healthcare, Inc. v. Price*, 860 F.3d 335, 345 & n.4 (5th Cir. 2017) (citing, in note 4, Medicare manuals explaining that "Recovery Audit Contractors—who work with the Medicare Administrative Contractors, Zone Program Integrity Contractors, and Qualified Independent Contractors—'are paid on a contingency fee basis,' and the fees range from 9% to 17.5% of the overpayment amount").

Dr. Hammad filed a timely challenge to the MAC decision.

## DISCUSSION

## I.     Standard of Review

The MAC's decision constitutes final agency action subject to review in this Court.  42 U.S.C. § 1395ff(b); 42 U.S.C. § 405(g).  Under the Administrative Procedure Act ("APA"), the Secretary's decision must be reversed if it is

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A), (E).  While courts have not resolved conclusively whether the APA standard applies to federal court challenges to MAC final orders, or whether those of 42 U.S.C. § 405(g) apply requiring only "substantial evidence," *see Maxmed Healthcare, Inc. v. Price*, 860 F.3d 335, 340 (5th Cir. 2017), there is no dispute that even under the latter standard:  "The Secretary must apply the correct law and demonstrate that he has done so. While the court reviews the Secretary's decision with deference to the factual findings, no such deference is given to the legal conclusions. *Keeton v. Dep't of Health & Human Servs.,* 21 F.3d 1064, 1066 (11th Cir. 1994)."  *Pruchniewski v. Leavitt*, No. 8:04 CV 2200 T 23TBM, 2006 WL 2331071, at *6 (M.D. Fla. Aug. 10, 2006); *see also Anghel v. Sebelius*, 912 F. Supp. 2d 4, 14 (E.D.N.Y. 2012) (federal court "is not bound by the Secretary's conclusions or interpretations of law, or an application of an incorrect legal standard.").  Here, because no record evidence supports the MAC's purported factual findings, it "probably makes no difference," *Maxmed Healthcare*, 860 F.3d at 340, whether they are analyzed under the arbitrary-and-capricious standard or the substantial-deference standard.

## II.   Legal Framework

Through New Deal and Great Society legislation, the federal government entered into the business of providing large-scale public benefits.  The Medicare

program created by the Social Security Act Amendments of 1965 grew and grew,

and by fiscal year 1985, Medicare received more than 330 million claims.  HCFA

Ruling 86-1 (Feb. 20, 1986), at 6-7, 10.  At some point, the Department of Health

and Human Services ("HHS"), or its predecessor, the Department of Health,

Education, and Welfare, determined it was impractical to conduct post-payment

claims review for suspected overpayments on an individual claim basis.

Consequently, HHS began to use statistical sampling and extrapolation (or

projection) to calculate overpayment demands from Medicare providers. *See*

*County Home Health Service, Inc. v. Sullivan*, 931 F.2d 914, 922, 923 (D.C. Cir.

1991) (noting "sample adjudication" has been utilized since 1972).

Unsurprisingly, providers challenged HHS's move away from individualized

determinations toward statistical sampling on a number of bases, including that

such estimations deprived providers of their constitutional right to due process.

HCFA Ruling 86-1, at 3.  In Ruling 86-1, HHS's predecessor, Heath Care

Financing Administration ("HCFA"), rejected those challenges and explained its

justification for use of statistical sampling and extrapolation to project

overpayment demands, most specifically:

> Sampling does not deprive a provider of its rights to challenge
> the sample, nor of its rights to procedural due process. Sampling only
> creates a presumption of validity as to the amount of an overpayment
> which may be used as the basis for recoupment. The burden then
> shifts to the provider to take the next step. The provider could attack
> the statistical validity of the sample, or it could challenge the

> correctness of the determination in specific cases identified by the sample (including waiver of liability where medical necessity or custodial care is at issue). In either case, the provider is given a full opportunity to demonstrate that the overpayment determination is wrong. If certain individual cases within the sample are determined to be decided erroneously, the amount of overpayment projected to the universe of claims can be modified. If the statistical basis upon which the projection was based is successfully challenged, the overpayment determination can be corrected.

*Id.* at 11. Inherent in HCFA's conclusion that statistical sampling and extrapolation were permissible means of calculating and recouping Medicare overpayments and did not violate providers' due process rights was HCFA's assumption that recoupment would be sought based upon a Medicare contractor's practice:

> to project the overpayment by reviewing *a statistically valid sample* of beneficiary records and that if it were determined that the provider had been overpaid for the sample cases, it would project the results (*again using statistically valid methods*) to the entire population of cases from which the sample had been drawn. This would result in *a statistically accurate estimate* of the total amount the provider had been overpaid for services to these beneficiaries.

*Id.* at 2 (emphasis added).

Providers subject to overpayment demands based on statistical sampling and extrapolation, a process they labeled "sample adjudication," challenged HCFA Ruling 86-1 and the regulations promulgated in its shadow.  In *County Home Health Service, Inc. v. Sullivan*, the D.C. Circuit upheld the general practice of calculating overpayments by statistical sampling and extrapolation, and set out the

conditions under which such shortcuts comport with due process. In his opinion for the court, Chief Judge Mikva explained that under HCFA Ruling 86-1 any sample used must be comprised of "a randomly selected and statistically significant number of sample claims" and that "[t]he provider can also challenge the statistical validity of both the sample and the extrapolation." 931 F.2d at 916; *id.* at 921 (providers have "right to dispute denials in the sample and challenge the statistical validity of the extrapolation"); *id.* ("provider may also take issue with the statistical validity of an extrapolation from the sample"); *id.* at 922 (procedural due process not violated by statistical sampling "so long as the extrapolation is made from a representative sample and is statistically significant").

In *Chaves County Home Health*, the healthcare providers "never took issue with the statistical validity of the procedure" used to calculate their overpayment. *See id.* at 916; *see id.* at 921 ("Although they repeatedly emphasize that the sample sizes were too small, appellants failed to make any such objections to the statistical validity of the extrapolation in the proceedings below."); *see id.* at 922 (same).

The Medicare Program Integrity Manual ("MPIM") sets out guidance for Medicare contractors' use of statistical sampling to estimate overpayment assessments.[1]  Section 3.10.1.1 explains:  "These instructions are provided to

---

[1] The current statistical sampling guidelines are set out in Chapter 8 of the MPIM; however, at the time of the statistical sampling relevant to this case, they appeared

ensure that a statistically valid sample is drawn and that statistically valid methods are used to project an overpayment where the results of the review indicate that overpayments have been made."  Further, section 3.10.1.1 makes clear that the MPIM sets out a "process" for "conducting statistical sampling to project overpayments," and that the paramount requirement of the MPIM's statistical sampling guidelines is "the validity of the statistical sampling that was conducted or the projection of the overpayment."  To this end, section 3.10.1.1 requires that "[a]n appeal challenging the validity of the sampling methodology *must be predicated on the actual statistical validity of the sample as drawn and conducted.*" (emphasis added). As such, the MPIM itself requires application of statistical testing and assessment to "the sample as drawn and conducted," as opposed to hypothetical criticism about sampling methodology and demands for statistical best practices.

Section 3.10.1.5 requires that a "statistician" or "statistical expert" review "sampling methodology used to project overpayments," in order "to ensure that a statistically valid sample is drawn and that statistically valid methods for projecting overpayments are followed."   Section 3.10.10 provides a non-exhaustive list of 10 texts – including "Cochran, W.G., Sampling Techniques, 3rd ed., New York: John Wiley and Sons, 1977" – "that represent the minimum level of understanding that

in substantially similar form in Chapter 3 of the MPIM. This brief cites to the Chapter 3 MPIM guidelines relevant to this case.

the statistical expert should have."  MPIM § 3.10.1.5, § 3.10.10.

Section 3.10.2 requires CMS and its contractors to follow a procedure that results in a "probability sample," and insulates such samples from claims they are "not statistically valid" when "a particular probability sample design is properly executed, including, meeting the requirement of "using the correct formulas for estimation."

Section 3.10.4.3 notes that "[t]he size of the sample," among other factors, "will have a direct bearing on the precision of the estimated overpayment," and section 3.10.5.1 describes how confidence interval estimation can account for imprecision in a sample:

> In most situations the lower limit of a one-sided 90 percent confidence interval shall be used as the amount of overpayment to be demanded for recovery from the provider or supplier.  The details of the calculation of this lower limit involve subtracting some multiple of the estimated standard error from the point estimate, thus yielding a lower figure.  This procedure, which, through confidence interval estimation, incorporates the uncertainty inherent in the sample design, is a conservative method that works to the financial advantage of the provider or supplier.  That is, it yields a demand for recovery that is very likely less than the true amount of overpayment, and it allows a reasonable recovery that is very likely less than the true amount of overpayment, and it allows a reasonable recovery without requiring the tight precision that might be needed to support a demand for the point estimate. However, the PSC or Medicare contractor BI or MR unit is not precluded from demanding the point estimate where high precision has been achieved."

MPIM § 3.10.5.1.

According to the MAC's explanation of the section 3.10 sampling provisions, "the guidelines allow for smaller sample sizes and less precise point estimates" based on "the direction to the carriers to assess the overpayment at the lower level of a confidence interval---generally, the lower level of a ninety percent one-sided confidence interval." R. 00010 (continuing: "This results in the assumption, in statistical terms, that there is a ninety percent chance that the actual overpayment is higher than the overpayment which is being assessed, thus giving the benefit of the doubt resulting from any imprecision in the estimation of the overpayment to the appellant, not the agency."). In other words, the guidelines allow for less precision in the sample *so long as* the extrapolation process provides safeguards that inure to the benefit of the provider, and provides statistically reliable assurances that the overpayment assessment is below the actual overpayment amount.

As the MAC summed up MPIM guidelines: "The instructions are intended to ensure that a statistically valid sample is drawn and that statistically valid methods are used to project overpayments . . . ." R. 00010.

## III.   The Medicare Appeals Council Erred As A Matter Of Law And Fact In Reversing the Administrative Law Judge's Decision Invalidating The Extrapolated Overpayment Demand

The decision of the MAC – reversing the ALJ's decision invalidating SafeGuard's extrapolation – was erroneous because it was based on errors of law

18

and findings of fact that are not supported by substantial evidence.  Consequently, this Court should reverse the Council's erroneous conclusion that SafeGuard's statistical sampling and extrapolation were valid, and remand this case to the Council with directions to calculate Dr. Hammad's overpayment assessment based only on the actual claim overpayments as determined in the various levels of review below, without extrapolation to other non-reviewed claims.

**A.**     The MAC erred as a matter of law by concluding that Medicare contractors need not follow the prevailing laws and assumptions of probability and statistics when imposing extrapolated overpayment assessments based on review of a sample of claims.

In its referral memorandum to the MAC, CMS claimed the ALJ "erred as a matter of law in finding the 'ZPIC's sampling was invalid' based on" Dr. Haller's expert declaration and hearing testimony, because "[t]he standards Dr. [Haller] attempts to impose are inconsistent with the sampling requirements in Ruling 86-1 and the *MPIM*."  R. 0065.  As noted, CMS's chief complaint with Dr. Haller's expert analysis is not that it was refuted by record evidence or that it is incorrect. Instead, CMS urged that the statistical texts upon which Dr. Haller relies, while referenced in the MPIM, are not incorporated into CMS sampling requirements, and thus, the CMS contractors' failure to recognize and properly apply the formulas in those texts is irrelevant to this case.   R. 00066.

19

The MAC identifies this as CMS's principal argument, R. 00008, references Dr. Hammad's response, R. 00009, 00017 (Dr. Haller "asserts that '[t]he laws and assumptions of probability and statistical theory must be met if the methodology is to be statistically valid'"), and appears to have agreed with CMS.  While on some esoteric concepts statistical experts might disagree as to applicable law and assumptions of probability and statistical theory, there can be no serious argument that due process and relevant laws and regulations require that "sample adjudication" for overpayment demands must be conducted in accord with the assumptions of probability and statistical theory – whatever they are determined to be through statistical evidence.

As discussed above, CMS's own position, inherited from its predecessor, HCFA, is that statistical sampling and projection is only permissible, and only comports with due process, when it involves "a statistically valid sample," employs "statistically valid methods," and results "in a statistically accurate estimate of the total amount the provider had been overpaid."  HCFA Ruling 86-1, at 2.

The MPIM itself seeks to "ensure that a statistically valid sample is drawn and that statistically valid methods are used to project an overpayment," MPIM § 3.10.1.1, thus it requires CMS contractors to employ the services of a professional statistician, who, at a minimum, has an understanding of the ten texts set out in section 3.10.10, in order "to ensure that a statistically valid sample is drawn and

that statistically valid methods for projecting overpayments are followed, MPIM §

3.10.1.5, and requires them to use "the correct formulas for estimation," MPIM §

3.10.2.

These agency directives themselves make clear that "sample adjudication"

must follow the laws and assumptions of probability and statistical theory.

Otherwise, the requirements to use a statistically valid sample and statistically

valid methods become meaningless.

To the extent these agency directives can be read any other way,

constitutional due process provides an independent requirement that "sample

adjudication" must follow the laws and assumptions of probability and statistical

theory. In the seminal case addressing the issue, the D.C. Circuit recognized that

"sample adjudication" must involve "a randomly selected and statistically

significant number of sample claims," that extrapolation can only be made from "a

representative sample" that "is statistically significant," and that a provider must be

allowed to "challenge the statistical validity of both the sample and the

extrapolation." *County Home Health Service,* 931 F.2d at 916, 921-22. The D.C.

Circuit's recognition that both the sample and the extrapolation must be

statistically valid is nothing short of a statement that sampling and extrapolation

must follow the laws and assumptions of probability and statistical theory.

Finally, Congress, through the Medicare Prescription Drug, Improvement, and Modernization Act of 2003, P.L. 108-173, 117 Stat. 2066, § 935 (Dec. 8, 2003) (codified at 42 U.S.C. § 1395ddd), has imposed a statutory requirement that any extrapolated overpayment demand be premised on a statistically valid random sample and employ statistically valid methodology.  Section 1395ddd prohibits use of extrapolation to calculate overpayments unless the "Secretary determines—(A) there is a sustained or high level of payment error; or (B) documented educational intervention has failed to correct the payment error." 42 U.S.C. §1395ddd(f)(3). Congress further amended the Notes to section 1395ddd, directing that section 1395ddd(f)(3) "*shall apply to statistically valid random samples* initiated after the date that is 1 year after the date of the enactment of this Act." P.L. 108-173, 117 Stat. 2066, § 935 (emphasis added).  As such, in 2003, Congress limited the circumstances in which "extrapolation" could be used to project overpayments, and Congress imposed a requirement that "extrapolation" could only be used with statistically valid random samples.  Congress's use of the term "extrapolation" and its limitation on its use to "statistically valid random samples" represent Congress's clear dictate that CMS follow the laws and assumptions of probability and statistical theory.  Otherwise, Congress's limitations would be meaningless. To the extent CMS regulations and guidelines do not requiring sample adjudication to follow the laws and assumptions of probability and statistical theory, such

agency regulations and guidelines are invalid, outside the range of permissible

interpretations, and subject to no deference under *Chevron, U.S.A., Inc. v. Natural*

*Resources Defense Council, Inc.*, 467 U.S. 837 (1984).

In sum, all relevant authority dictate that use of statistical sampling to

project extrapolated overpayment demands must follow the laws and assumptions

of probability and statistical theory.  To the extent the MAC based its decision on a

contrary legal conclusion the MAC made an error of law and its decision must be

reversed.

**B.**      To the extent the Court prefers to avoid the larger question and address the

MAC decision as more of an as-applied challenge, the Council erred as a matter of

law in concluding that it followed controlling law and Dr. Hammad was not denied

due process when SafeGuard issued a recoupment order against him based on a so-

called "extrapolation" of findings produced by a review of a small sample of

overpayments that did not follow the laws and assumptions of probability and

statistics, and thus was not a statistically valid extrapolation, as that term is used in

42 U.S.C. §1395ddd(f)(3), and related rules, regulations, manuals, and guidance.

Unequivocal law dictates that Dr. Hammad has a clear due process right to

"challenge the statistical validity of both the sample and the extrapolation," *County*

*Home Health Service*, 931 F.2d at 916, 921-22, and that, at most, "[s]ampling only

creates a presumption of validity as to the amount of an overpayment," that may be

overcome by statistical proof. *See* HCFA Ruling 86-1, at 11 ("The burden then shifts to the provider to take the next step. The provider could attack the statistical validity of the sample . . . ."); MPIM § 3.10.1.1 ("An appeal challenging the validity of the sampling methodology must be predicated on the actual statistical validity of the sample as drawn and conducted.").

That is precisely what Dr. Hammad did in this case. He presented unrefuted expert evidence that the sample as drawn and conducted was not a representative sample along four separate criteria, and that SafeGuard used incorrect formulas for extrapolation in violation of the laws and assumptions of probability and statistical theory, specifically those set out in W.G. Cochran's text listed in section 3.10 of the MPIM, *see* R. 00082, 00086.

First, Dr. Hammad's statistical expert Dr. Haller explained in his unrefuted expert reports that the "sample as drawn" was biased and not representative of the larger universe with respect to (1) principle diagnoses on the claims, (2) procedure codes that were billed, (3) total amounts paid per beneficiary (because the sample was biased toward beneficiaries with a higher volume of claims per beneficiary), and (4) number of claims per beneficiary. R. 02527-29.

Second, Dr. Haller demonstrated in uncontroverted expert reports and hearing testimony that he had established through statistical testing that stratified average overpayments in the sample as drawn and conducted were not normally

distributed, and therefore an essential prerequisite for application of SafeGuard's

confidence interval formula for extrapolation was not met.  R. 02529-31; R. 00081-

83, 00084, 00087, 00089-90.

1.     As an initial matter, the MAC appeared to take issue with Dr. Haller

subjecting SafeGuard's statistical sampling and extrapolation to statistical testing.

*See* R. 00017 (MAC stating: "The appellant's statistician is essentially arguing that

the sampling and extrapolation was not statistically valid based on the ultimate

*results* of the statistical sampling when run through certain tests that he conducted

here, specifically Chi-Squared and Kolgomorov-Smirnov tests.") (emphasis in

original) (referencing Dr. Haller's response to CMS referral memo, located in this

record at R. 00080-83). To the extent the MAC based its decision to reverse the

ALJ's invalidation of the extrapolation on Dr. Hammad challenging the statistical

validity of SafeGuard's sampling and extrapolation by use of expert testing and

analysis of SafeGuard's *results*, the MAC erred as a matter of law.  As noted,

section 3.10.1.1 of the MPIM requires a provider to predicate a challenge to the

validity of the sampling methodology "on the actual statistical validity of the

sample as drawn and conducted."  MPIM § 3.10.1.1.  In fact, federal courts have

chided providers in previous challenges specifically for failing to challenge *the*

*results* through statistical testing. *See, e.g., Anghel v. Sebelius*, 912 F. Supp. 2d 4,

20 (E.D.N.Y. 2012) (rejecting provider's suggestion that a sample used for

extrapolation was not a statistically valid random sample largely because "Plaintiff does not present any data or evidence that would lead to the conclusion that the proportion of the services in the sample is not representative of the proportion that exists in the defined universe."); *Pruchniewski v. Leavitt,* No. 04 Civ. 2200, 2006 WL 2331071, at *11 (M.D. Fla. Aug. 10, 2006) ("Dr. Intrilligator's simple test for the representativeness of this sample is also interesting, but Plaintiff does not demonstrate that it dictates a conclusion that the sample was unrepresentative. As before the ALJ, Plaintiff offers no legal or statistical authority to the court on what is 'representative.'").

    2.    The MAC went on to address Dr. Haller's specific proof that the sample as drawn and conducted was not representative along several lines.  With regard to Dr. Haller's tests showing that total amounts paid per beneficiary and volume of claims per beneficiary were skewed high in the sample, the MAC explained that these biases were accounted for by weighting the mean overpayments and volume of claims from each stratum.  R. 00018-19.  However, when addressing Dr. Haller's uncontroverted proof that the sample was skewed with regard to principle diagnoses and with regard to procedure codes, the MAC failed to address this serious statistical bias, instead, resorting to a slew of non-sequiturs, such as the fact that SafeGuard chose not to focus on a sub-set of procedure codes, that SafeGuard chose the beneficiary as the sample unit instead of

the procedure code, and that it would have been impractical to sample a statistically significant number of line items for each of the 84 billing codes used by Dr. Hammad over the relevant period.  *See* R. 00018.

Dr. Haller understood that SafeGuard was not measuring the billing codes and principle diagnoses in its sampling; Dr. Haller included his proofs of sample bias along these lines to establish that the sample was biased and not representative of the frame, and therefore not a statistically valid random sample, and therefore not eligible to be extrapolated.  *See* R. 00084.  Had the MAC adequately considered this uncontroverted expert statistical evidence, it would have concluded SafeGuard failed to draw a statistically valid random sample, and would have been required to follow Congress's dictate prohibiting extrapolation in the absence of such a statistically valid random sample.  The MAC's failure to properly consider and account for Dr. Haller's uncontroverted statistical evidence as to the sample's bias was an error of law, constituted arbitrary and capricious agency action and led to a finding unsupported by any record evidence.

3.     Next, the MAC erred as a matter of law *and* fact when it overturned the ALJ conclusion that SafeGuard's extrapolation was invalid because SafeGuard failed to use correct formulas for extrapolation and estimation.

Dr. Hammad presented the uncontroverted testimony and evidence from his expert Dr. Haller to establish SafeGuard used an incorrect formula for

extrapolation. Specifically, Dr. Haller established by record evidence that (1) a prerequisite for application of the estimation formula SafeGuard used in this case – namely, $1,316\{\text{Stra.Avg.OP} - t_{2,df}\text{Std. Error of Strat.Avg. OP}\}$ – is that the stratified average overpayments be normally distributed, and (2) unrefuted statistical testing performed by Dr. Haller established the stratified average overpayments were not normally distributed in SafeGuard's sample. *See* R. 00084, 00087. In short, Dr. Haller explained in unrefuted evidence that, in the absence of a "normal distribution" of the stratified average overpayments, the lower confidence limit does not provide an overpayment estimate with a ninety percent (90%) probability of being less than the total overpayment from the frame. *See* R. 00087.

Curiously, the MAC itself admitted having difficulty following this argument. *See* R. 00020. Perhaps, this is why the MAC (1) failed completely to address Dr. Hammad's specific contention that SafeGuard did not "use the correct formulas for estimation," the sixth criterion for a "properly executed" "probability sample design," of section 3.10.2 of MPIM, and (2) reached the tautological conclusion that the "non-normal" distribution of estimated overpayments does not invalidate SafeGuard's extrapolation because "the overpayment demands are reduced to lower confidence levels, in nearly every assessment (including here)." R. 00020.

This MAC discussion betrays a serious misunderstanding of the unrefuted testimony provided by Dr. Hamamd's statistical expert (1) that it is the confidence interval calculation *itself* that is unreliable on account of the absence of a normal distribution of the stratified average overpayments in the sample, and (2) that SafeGuard used the incorrect estimation formulas in the light of the non-normal distribution, and thus its "extrapolation" calculation is invalid, and extrapolation is inappropriate here.  In fact, the MAC's discussion of this issue is so convoluted and confusing it is difficult to say conclusively whether it reflects an error of law or a finding of fact not supported by substantial evidence.  It is not difficult to conclude the MAC's decision must be reversed.

The MAC described the general relationship between precision of the sample and extrapolation methodology, stating, "the guidelines for conducting statistical sampling are designed by CMS to allow wide latitude in sampling design as long as the ZPIC assesses the resulting overpayment at the lower confidence level, generally, the lower level of a one-sided 90% confidence interval."  R. 00016-17.  Then, with regard to this case, the MAC stated in conclusory fashion that the overpayment assessment – the total demand extrapolated from the sample – was "reduced . . . to the lower limit of a one-sided 90% confidence interval."  R. 00017.  However, in doing so, the MAC fails to acknowledge or address the serious errors *in the extrapolation methodology itself* proven without contradiction

by Dr. Hammad's statistical expert and found by the ALJ – errors that establish SafeGuard used incorrect formulas for estimation and extrapolation, and that the overpayment assessment in this case was not *in fact* reduced to the lower end of the one-sided 90% confidence interval.  In discussing Dr. Haller's uncontroverted statistical proofs that SafeGuard's extrapolation methodology – SafeGuard's purported use of a confidence interval formula to determine the lower end of a one-sided 90% confidence interval – was "not reliable," the MAC simply assumed the ultimate question – whether SafeGuard's application of the confidence interval formula here actually resulted in a reliable calculation of the lower end of a one-sided 90% confidence interval.  In rejecting Dr. Haller's unrefuted proof that the extrapolation formula was applied incorrectly and failed to produce a reliable calculation of the lower end of the one-sided 90% confidence interval, the MAC stated:  "In any event, the Council does not find the statistician's arguments to be compelling where the overpayment demands are reduced to lower confidence levels in nearly every assessment (including here), and the guidelines specifically contemplate wide latitude in sampling precision." R. 00020.

The MAC's tautological explanation – that Dr. Haller's statistical analysis (showing that the confidence interval formula was improperly and unreliably used here, and thus the purported calculation of the lower end of the one-sided 90% confidence interval was invalid) was being rejected *because* the overpayment

demand here "was reduced to lower confidence levels" – represents the most basic and profound type of error, and must be reversed here.

While this MAC discussion appears to reflect a fundamental error of law, to the extent it is deemed to be a factual finding, it is arbitrary and capricious <u>and</u> wholly unsupported by any record evidence.

*a.*     First, whatever SafeGuard did in using the wrong formula to project an estimated overpayment demand from Dr. Hammad, it was not doing "extrapolation," as that term was used by Congress in 42 U.S.C. §1395ddd(f)(3). The only reasonable interpretation of the statutory term, "extrapolation" – in formulas using sample average and sample standard deviation – includes a requirement of "normal distribution" as understood and explained by statisticians who have developed and articulated the governing standards.  As such, the Secretary's non-technical interpretation of the term "extrapolation" is outside the range of permissible interpretations under *Chevron.*

Here, in unrefuted testimony and reports, Dr. Haller explained in detail that SafeGuard's estimated overpayment extrapolated from a sample with a non-normal distribution of stratified average overpayments violated the governing laws and principles of statistics, principally because normal distribution is a "necessary condition" for application of the confidence interval calculation for extrapolation used by SafeGuard.  Accordingly, the statistical process described by the statutory

term "extrapolate" cannot reasonably be interpreted, as the MAC did here, to allow for estimating overpayments to the entire larger frame, because uncontroverted evidence established that the sample as draw and conducted – in which stratified average overpayments were not normally distributed – did not meet the prerequisites for application of SafeGuard's so-called extrapolation calculation.

Consequently, the MAC's implicit interpretation of the term "extrapolate," as that term is used in 42 U.S.C. § 1395ddd(f)(3) and related regulations, is entitled to no deference under *Chevron*.[2]

*b.*     Further, this Court will search the MAC's discussion of this issue in vain for any citation reference to any record evidence to support its tautological conclusion.  *See* R. 00020.  In fact, this Court will search the entire record of admitted evidence in this case for any evidence contradicting or refuting Dr. Haller's expert conclusions upon which the MAC even arguably based its tautological conclusion.

To be clear, this is not a case involving a battle of expert statisticians; it is not a case where a provider's statistician is arguing for optimal sampling or best statistical practices; it is not a case where the MAC is opting for one statistical expert's analysis over another's.  This is a case where Dr. Haller's statistical expert report and testimony, relying in turn on established statistical texts recognized in

---

[2] For precisely the same reasons, the MAC's decision constitutes an erroneous application of law to the facts and circumstances of this case.

the MPIM, are completely unchallenged and un-contradicted by any record evidence.

The MAC minimizes and glosses over the fact that the record contains no statistical evidence contrary to Dr. Haller's expert report and testimony by stating, "In this case, our understanding of the detailed issues would have been enhanced had the ZPIC's [SafeGuard's] statistician who had implemented the sampling in this case testified at the ALJ hearing and/or responded to the appellant's statistician's June 30, 2017 arguments in response to the agency referral memorandum." R. 00020-21. (This despite SafeGuard's assertion at an earlier pre-hearing conference that its chief statistician Alina Moya would testify at the hearing. R. 13757. This despite testimony from SafeGuard statistician Noel McKetty that he and Ms. Moya "would like an opportunity" to submit an response to Dr. Haller's report and testimony.  *See* Hearing Recording at 1:00:00-1:00:30.) Further, this Court can review in vain the entirety of the vague and general hearing testimony of Noel McKetty for any testimony or evidence addressing Dr. Haller's detailed, evidence-based testimony and conclusions.  *Id.* at 00:51:15-1:01:58 and 1:10:04-1:16:45.

In this way, Dr. Hammad's case is entirely unlike others where federal courts have rejected challenges to statistical methodology upheld in MAC decisions where the record contained substantial evidence.  *See, e.g., John Balko &*

33

*Assocs. v. Sebelius*, No. 12CV0572, 2012 WL 6738246, at *11 (W.D. Pa. Dec. 28, 2012) (noting the question is not whether the most precise sample was drawn, but only "whether the sample size was sufficient to be statistically valid," and stating, "The AR contains substantial evidence to support the MAC's conclusion that the statistical sample size, including strata size, was large enough to be valid, which is all that is required."); *Anghel v. Sebelius*, 912 F. Supp. 2d 4, 20 (E.D.N.Y. 2012) (noting, "Plaintiff does not present any data or evidence that . . . the sample is not representative . . . ," thus concluding "there was substantial evidence to support the ALJ's and MAC's findings, and the Court can discern no legal error in the statistical analysis based upon the supposed disproportions in the SVRS"); *Miniet v. Sebelius*, No. 10-24127-CIV, 2012 WL 2930746, at *6 (S.D. Fla. July 18, 2012) ("upon a review of the record, the finding that the strata are non-overlapping is supported by substantial evidence" provided by statistician Alina Moya); *Transyd Enterprises, L.L.C. v. Sebelius*, No. CIV.A. M-09-292, 2012 WL 1067561, at *8 (S.D. Tex. Mar. 27, 2012) (regarding the substantial battle of the experts: "the Court's role is not to determine which expert was more persuasive on this point, but whether substantial evidence, . . . exists to support the MAC's determination . . . . It is worthwhile to again note that the ALJ who heard the experts' testimony found both experts to be 'well-prepared, well-informed, and generally persuasive.' Not surprisingly, therefore, the MAC implicitly accepted Dr. Dobbins's [ALJ's

independent expert's] explanation . . . . The Court finds that in doing so, *the MAC rested its decision on substantial evidence*.") (emphasis added).

In sum, to the extent the MAC concluded sampling errors and imprecision <u>and</u> use of incorrect extrapolation formulas must be excused or overlooked here because it found that SafeGuard reduced its demand to the lower end of a one-sided 90% confidence interval in its extrapolation calculations *as a matter of fact*, the MAC's purported factual conclusion is supported by no record evidence whatever.   To the extent, the MAC concluded that SafeGuard complied with the MPIM, R. 00017 ("There is nothing about this process that is in violation of the processes set out in the sampling guidelines"), 42 U.S.C. § 1395ddd(f)(3), and the dictates of constitutional due process because it reduced its demand to the lower end of a one-sided 90% confidence interval in its extrapolation calculations, this conclusion is an error of law.

## <u>CONCLUSION</u>

For the stated reasons, the MAC decision approving SafeGuard's use of extrapolation in calculating its overpayment assessment against Dr. Hammad must be reversed.

Dated: August 10, 2018    Respectfully submitted,

          /s/
         Sean M. Ellsworth, Esq.
         Florida Bar No. 39845
         Ellsworth Law Firm, P.A.
         420 Lincoln Road, Suite 601
         Miami Beach, Florida 33139
         (305) 535-2529 (phone)
         (305) 535-2881 (fax)
         sean@ellslaw.com

         Christopher A. Parrella, J.D., CHC, CPC
         2333 Brickell Avenue, Suite A-1
         Miami, Florida 33129
         (admitted *pro hac vice*)

         *Attorneys for Plaintiff*

## CERTIFICATE OF COMPLIANCE

   I hereby certify this document complies with the length limitation set forth in Northern District of Florida Local Rule 7.1(F).  Plaintiff's Motion For Judgment On The Pleadings Pursuant to Rule 12(c) And/Or For Summary Judgment Pursuant To Rule 56 Of The Federal Rules Of Civil Procedure is 499 words, and the incorporated Memorandum of Law in support of judgment for Plaintiff is 7998 words.

         /s/
         Sean M. Ellsworth

## CERTIFICATE OF SERVICE

   I hereby certify that on August 10, 2018, a true and correct copy of the foregoing has been filed with the Court's CM/ECF filing system which will send notification of such filing to all counsel of record.

         /s/
         Sean M. Ellsworth