IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

MUSTAFA A. HAMMAD, M.D.,

       Plaintiff,

vs.                                    CASE NO. 5:17-cv-288-RH-GRJ

ALEX M. AZAR II,
Secretary, United States Department
of Health and Human Services,

       Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff Mustafa A. Hammad, M.D., appeals to this Court from a final

decision of the Secretary of Health and Human Services, rendered by the

Medicare Appeals Council ("Council") pursuant to 42 U.S.C. § 1395ff(b)

and 42 C.F.R. § 405.1136.  ECF No. 1.  Relying on statistical sampling and

extrapolation, the Council determined that Plaintiff received Medicare

overpayments for services provided to patients during 2006-2008, and that

Plaintiff was liable for overpayments of non-covered charges initially

assessed at more than $1.2 million.  In this appeal, Plaintiff contests the

methodology used to determine the overpayment amount, but not the

Council's denial determinations on individual claims in the statistical

sample.  ECF No. 1. The Secretary has answered, and both parties have

filed briefs outlining their respective positions. ECF Nos. 7, 20, 23, 24. The parties have also filed joint administrative record excerpts. ECF Nos. 27, 29.  Upon due consideration of the parties' arguments and the administrative record, and for the reasons discussed below, the undersigned respectfully recommends that the Secretary's decision be **AFFIRMED**.

## I. Background: Medicare Overpayments Appeals

Medicare is a federally-funded health insurance program for the elderly and disabled that is overseen by the Secretary through the Centers for Medicare and Medicaid Services ("CMS")[1]. *See* 42 U.S.C. § 1395, *et seq.* The Social Security Act ("the Act") governs and sets forth general conditions under which services will be covered by the Medicare program. The Secretary, through CMS, is charged with interpreting the statute and promulgating regulations, guidelines, and policies that define the scope of Medicare coverage and terms of payment to providers. To facilitate administration of this program, CMS contracts with private companies. *See* 42 U.S.C. § 1395h; 42 U.S.C. § 1395u; 42 C.F.R. §§ 421.1 - 421.404. Healthcare providers and suppliers submit claims for reimbursement under Medicare to the contractor in their region. The contractor then determines

---

[1] CMS was formerly known as the "Health Care Financing Administration" (HCFA).

whether the services provided are covered by Medicare; if so, the contractor reimburses the provider or supplier.  *See id.*

A 1986 Medicare administrative ruling permits CMS and its contractors to use statistical sampling to perform post-payment claim audits and determine whether providers received overpayments of Medicare claims. *See* CMS Ruling 86-1, Use of Statistical Sampling to Project Overpayments to Medicare Providers and Suppliers (Feb. 20, 1986). CMS has promulgated guidelines in the form of manuals that contain the requirements for sampling and overpayment estimation. The steps to be applied or used in a sampling case can be found in the Medicare Program Integrity Manual ("MPIM"), pub. 100-08, ch. 3, § 10 (eff. 5-10-04, now at MPIM ch. 8, eff. 1-2-19).[2]

Under the MPIM, the major steps in conducting statistical sampling are:

(1) Selecting the provider or supplier;
(2) Selecting the period to be reviewed;
(3) Defining the universe, the sampling unit, and the sampling frame;
(4) Designing the sampling plan and selecting the sample;

---

[2] The MPIM is publicly available on the CMS website: *www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/.*  The MPIM was updated effective January 2, 2019.  *See id.*  References to the MPIM in this case are to the version in effect at the time of the audit of Plaintiff's Medicare claims.

(5) Reviewing each of the sampling units and determining if there was an overpayment or an underpayment; and, as applicable

(6) Estimating the overpayment.  Where an overpayment has been determined to exist, follow applicable instructions for notification and collection of the overpayment.

MPIM § 3.4.1.3.

A recent HHS Office of Inspector General ("OIG") report summarized

the overpayment appeals process as follows:

When CMS determines that a provider received an overpayment, the provider has the right to appeal the determination. At the first level of appeal, the [Medicare Administrative Contractor or MAC][3] that originally processed the claim reviews the overpayment determination and any sampling methods applied. If the provider disagrees with the redetermination by the MAC, the provider may appeal any portion of the MAC review to the [Qualified Independent Contractor or QIC]. The QIC review, referred to as a "reconsideration," is performed without deference to the redetermination by the MAC. After the QIC review, the provider may further appeal the reconsideration to an Administrative Law Judge, the Medicare Appeals Council, and Federal court.

Medicare & Medicaid Guide ¶ 62218 at 5 (C.C.H.), 2020 WL 5594628

(citing 42 U.S.C. § 1869 and 42 C.F.R. part 405, subpart I).

With respect to extrapolated overpayments, the OIG explained:

When a program integrity contractor identifies an overpayment through statistical sampling and extrapolation, the provider may challenge the application of Medicare requirements (e.g., coverage requirements), the statistical methodology that the program integrity

---

[3] The Medicare Appeals Council is also sometimes referred to as the "MAC".  For the sake of clarity, the Court will use "Council".

contractor used to estimate the overpayment in the sampling frame, or both[.]

If an overpayment (a sample claim) is overturned during the administrative appeals process, then the extrapolated overpayment is recalculated given the updated sample results. The provider is liable for the revised extrapolated amount. In contrast, if the provider successfully challenges the statistical methodology, the provider is liable only for the overpayment amounts identified in the sample. For extrapolations calculated by program integrity contractors, the statistical methods are reviewed against the sampling criteria outlined in the version of the PIM in effect at the time the extrapolation was made.

During the first two levels of appeal, the MAC's or QIC's statistical expert assessing the validity of the program integrity contractor's extrapolated overpayment will consider any arguments submitted by the provider . . . . [E]ven if a program integrity contractor follows [the PIM] requirements, the extrapolated overpayment can still be overturned if documentation is not available supporting that these requirements were met or if the program integrity contractor fails to meet certain administrative requirements in the PIM. If statistical sampling and overpayment estimation methodology are found to be invalid on appeal, the provider may be liable for the actual overpayment identified in the sample but not the extrapolated amount.

Extrapolation reviews at the QIC level are guided by the specific protocol published by CMS in Appendix B of the QIC Manual. This protocol lists the review steps necessary to verify that the program integrity contractor's extrapolated overpayment complies with the PIM. Currently, no similar unifying guidance other than the PIM exists for the MAC level of review.

*Id.* at 5-6 (citing MPIM §§ 8.4.2 and 8.4.9 (2019)).

Regarding the CMS' extrapolation methodology, the U.S. Court of

Appeals for the Fifth Circuit recently explained:

The extrapolation methodology may be imperfect, but it is the product of a complex balance of interests. At a minimum, it constitutes

substantial evidence in support of the agency's decision. *Cf. Maxmed Healthcare, Inc. v. Price*, 860 F.3d 335, 343 (5th Cir. 2017) ("Congress clearly envisioned extrapolation in overpayment determinations involving home health agencies like [the plaintiff], and the Secretary's reliance on extrapolation as a tool was justified."). If anything, the extrapolation methodology is provider friendly. The extrapolation does not assume that the average overpayment in the random sample occurred for the universe of claims. Rather, the agency assumes that the average overpayment for all claims is equal to a number that there is a 90% chance is *smaller* than the actual overpayment. *See* [MPIM] § 8.4.5.1 (explaining that the agency uses the lower limit of a 90% confidence interval as its overpayment estimate).

*Palm Valley Healthcare v. Azar,* 947 F.3d 321, 330 (5th Cir.), *cert. denied,*

__ U.S. __, 141 S.Ct. 262 (2020).

## II. Factual and Procedural Background

The facts underlying this appeal are summarized in the Council's decision that is under review. *See* ECF No. 27 at 6-8. A Medicare Zone Program Integrity Contractor ("ZPIC") called SafeGuard Services, LLC ("SafeGuard" or "ZPIC") conducted a post-payment audit of Medicare claims paid to Plaintiff for dates of service from January 1, 2006, through December 31, 2008. As explained in more detail below, SafeGuard conducted stratified sampling of the universe of beneficiaries, assigning them to one of five strata according to total paid dollar amounts for the claims of that beneficiary for the service dates at issue. A random sample of 50 claims (10 claims from each stratum) were selected for review. In

June 2009, SafeGuard requested records pertaining to the sample of 50 individual beneficiaries, involving 811 claims.  *Id.*

In June 2012, SafeGuard informed Plaintiff that it had identified a high rate of error, determining that 100% of the sample claims had been paid in error.  SafeGuard extrapolated that overpayment to the universe of claims, resulting in an overpayment calculation of over $1.2 million.  Based on the audit and extrapolation, another Medicare contractor, First Coast Service Options, Inc. ("FCSO"), demanded repayment of the full amount.  On redetermination, the FCSO appeals department concluded that Medicare had only partially overpaid the claims.  Plaintiff requested reconsideration by the QIC, $Q^2$ Administrators (the "QIC").  The QIC also issued a partially favorable determination, allowing coverage for some additional claims, downcoding others, and fully denying the remaining claims.  The QIC upheld the sampling and extrapolation as complying with the applicable guidelines.  *Id.* at 6-7.

On April 13, 2013, Plaintiff requested review by an Administrative Law Judge ("ALJ").  Before the ALJ, and relying on an expert statistician, Plaintiff challenged the validity of the statistical sampling and extrapolation as well as the denials of coverage and downcoding for the remaining beneficiaries.  Plaintiff argued that the sample was biased and that the

extrapolation was invalid based on testing performed by Plaintiff's statistician. Plaintiff also disputed the claim denials for the individual beneficiaries and services at issue. *Id.* at 6.

Following a hearing, the ALJ issued a partially favorable decision. The ALJ adopted the findings of Plaintiff's statistician with respect to the statistical sample and adopted Plaintiff's analyses with respect to the individual claims. The ALJ determined that SafeGuard's statistical sampling was invalid and, therefore, so was the extrapolated overpayment. The ALJ adopted Plaintiff's reasoning that the sample was biased toward beneficiaries with higher paid claims and that the sample was not a statistically valid random sample because the distribution of overpayments did not follow a bell-shaped curve reflecting normal statistical distribution. Regarding the individual services, the ALJ determined that Medicare covered the vast majority of services at issue. The ALJ determined that Plaintiff was liable for the remaining overpayment amount. *Id.* at 8.[4]

CMS requested that the Council undertake "own motion" review of the ALJ decision, on the ground that the ALJ had erred as a matter of law in invalidating SafeGuard's statistical sampling. Based on its review of the

_____

[4] The ALJ estimated Plaintiff's total liability for individually adjudicated claims was around $15,500. R. 418 n.7.

record, the Council concluded that "the arguments offered by [Plaintiff's]

statistician, on which the ALJ based his decision, do not provided a basis

for invalidating the statistical sampling methodology employed in this case."

*Id.* at 16.  The Council explained SafeGuard's procedures in some detail as

follows:

> The frame of 1,316 beneficiaries was arranged from the smallest total
> dollar amount paid for a beneficiary's claims to the largest total
> amount paid for a beneficiary's claims for the time period at issue.
> The total Medicare payment on these 1,316 beneficiar[ies]' claims
> was $1,291,869.67. The frame beneficiaries were then assigned to
> one of five strata. The total amount of $1,291,869.67 was divided by
> five, and each stratum from 1 [to] 5 was assigned a number of
> consecutive beneficiaries from the frame such that the total dollar
> amount paid for all beneficiaries assigned to each stratum was
> approximately equal [among] the five strata. . . . The ZPIC then
> randomly selected ten beneficiaries from each stratum
> for a total sample size of fifty beneficiaries. The sampling
> documentation indicates the formula the ZPIC used in determining
> appropriate sample size . . . Following selection and review of the fifty
> sampled claims, the ZPIC calculated the mean overpayment for the
> ten sampled claims within each stratum and extrapolated the results
> of the ten beneficiaries' mean overpayments in each stratum to all
> other beneficiaries *in that stratum* . . . [t]he mean overpayment in
> each stratum was "weighted" by the number of beneficiaries in each
> stratum before calculating the total overpayment estimate . . . Per the
> Medicare guidelines, the ZPIC then reduced the overpayment to the
> lower bound of a 90% one-sided confidence interval.

R. 15-16.[5] The "weighting" process described by the Council is described in

the MPIM. *See* MPIM, Chapter 3, § 3.4.5.1 ("In stratified sampling, an

---

[5] The sampling and extrapolation methodology used in this case is described in
SafeGuard's response during the ALJ appeal, prepared by SafeGuard's Chief

estimate is found for each stratum separately, and the weighted stratum

estimates are added together to produce an overall point estimate," i.e., the

difference between what was paid to the physician and what should have

been paid).

The Council observed that the guidelines are designed by CMS to

allow wide latitude in sampling design, so long as the ZPIC assesses the

resulting overpayment at the lower confidence level, "generally, the lower

level of a one-sided 90% confidence interval."  The Council noted that, by

regulation, it is required to afford substantial deference to those guidelines.

The Council concluded that SafeGuard had reasonably defined the

universe and sampling unit, organized the frame by total paid amounts per

beneficiary, stratified the frame's beneficiaries into five strata by total dollar

amounts paid per beneficiary, selected ten claims by random seed number

selection from each stratum, weighted the mean overpayments in each

stratum before adding them together to determine the point estimate, and

then reduced the overpayment assessment to the lower limit of a one-sided

90% confidence interval.  The Council held that "[t]here is nothing about

---

Statistician, Alina Moya,  ECF No. 29-1 at 4-11. The Sample Verification and Approval sheet in which the SafeGuard statisticians describe the sample design; the Extrapolation Worksheet; the Overpayment Worksheet (in the form of a lengthy EXCEL spreadsheet); and the Overpayment Projection sheet are found on Disk 3 of the electronic administrative record.  *See* ECF No. 30.

this process that is in violation of the processes set out in the sampling guidelines, nor is there any evidence that the ZPIC manipulated the process in any manner to achieve a higher assessment than would otherwise have occurred." *Id.* at 17-18.

After finding no "fatal flaw" in SafeGuard's sampling and extrapolation, the Council went on to consider the individual claims for four beneficiaries whose claims were directly contested in the CMS referral memorandum. *Id.* at 22.  Ultimately, the Council reversed the ALJ's decision invalidating SafeGuard's statistical sample, and partially modified and reversed the ALJ's decision with respect to the challenged individual services.  *Id.* at 34.  Plaintiff then appealed the final agency decision to this Court.  ECF No. 1.[6]

### III.  Standard of Review

This Court's review of the Secretary's decision is limited to determining "whether there is substantial evidence to support the findings of the . . . [Secretary], and whether the correct legal standards were applied." *Gulfcoast Med. Supply, Inc. v. Secretary, Dep't. of Health and Human Servs.*, 468 F.3d 1347, 1350 n.3 (11th Cir. 2006) ("[O]nce the Secretary renders a final decision on a Medicare claim, judicial review is

---

[6] A final extrapolated overpayment amount remains to be determined.

available 'in the same manner as is provided in 42 U.S.C. § 405(g) for old age and disability claims arising under Title II of the Social Security Act.'") quoting *Heckler v. Ringer,* 466 U.S. 602, 605 (1984)).  Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks omitted). It is not this Court's place to substitute its judgment for that of the agency, even if a preponderance of the evidence weighs against the agency decision. *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983); *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996).

A Medicare contractor may not use extrapolation to determine overpayment amounts unless the Secretary determines, *inter alia*, that "there is a sustained or high level of payment error." 42 U.S.C. § 1395ddd(f)(3)(A).  The determination of a "sustained or high level of payment error" that justifies extrapolation is entirely exempt from judicial review. *Id.* ("There shall be no administrative or judicial review . . . of determinations by the Secretary of sustained or high levels of payment errors under this paragraph."); *Palm Valley Healthcare,* 947 F.3d at 329; *see also Gentiva Healthcare Corp. v. Sebelius*, 723 F.3d 292, 297 (D.C. Cir. 2013) (plain meaning of 42 U.S.C. § 1395ddd(f)(3) was correct; the

error rate determination was not reviewable).  Thus, this Court cannot review the circumstances that made extrapolation appropriate under the statute, but it can review the methodology, including the sampling procedure, used for extrapolation.  *See id.*

## IV.  Summary of Parties' Arguments

Plaintiff contends that the Council erred as a matter of law by "concluding that Medicare contractors need not follow the prevailing laws and assumptions of probability and statistics when imposing extrapolated overpayment assessments based on a review of a sample of claims." ECF No. 23 at 23.  This argument stems from Plaintiff's assertion that statistical texts relied on by his expert, Dr. Harold Haller, are incorporated into CMS sampling requirements because they are referenced in the MPIM.  *Id.* Plaintiff argues that "there can be no serious argument that due process and relevant laws and regulations require that 'sample adjudication' for overpayment demands must be conducted in accord with the assumptions of probability and statistical theory – whatever they are determined to be through statistical evidence."  *Id.* at 20.

Plaintiff further contends that in this case he met his burden of overcoming the presumption of validity of the extrapolated overpayment through Dr. Haller's unrefuted expert evidence.  First, Plaintiff argues that

Dr. Haller determined that the sample as drawn was "biased and not representative of the larger universe with respect to (1) principal diagnoses on the claims, (2) procedure codes that were billed, (3) total amounts paid per beneficiary (because the sample was biased toward beneficiaries with a higher volume of claims per beneficiary), and (4) number of claims per beneficiary." *Id.* at 24 (citing R. 2527-29). According to Dr. Haller, because the sample was biased and not representative of the frame, it was not a statistically valid random sample and therefore it was not eligible to be extrapolated. *Id.* at 31 (citing R. 84). Plaintiff argues that the Council failed to properly consider and account for Dr. Haller's evidence as to the sample's bias. *Id.*

Second, Plaintiff argues that Dr. Haller "established through statistical testing that stratified average overpayments in the sample as drawn and conducted were not normally distributed, and therefore an essential prerequisite for application of SafeGuard's confidence interval formula for extrapolation was not met." *Id.* at 29 (citing R. 81-84, 87, 89-90, 2529-31). Dr. Haller opined that in the "absence of a 'normal distribution' of the stratified average overpayments, the lower confidence limit does not provide an overpayment estimate with a [90%] probability of being less than the total overpayment from the frame." *Id.* at 28 (citing R. 87). The

Council concluded that non-normal distribution did not invalidate the

extrapolation because the overpayment demand was reduced to a lower

confidence level.  Plaintiff asserts that the confidence interval calculation

itself is unreliable due to the absence of a normal distribution of the

stratified average overpayments in the sample, and that SafeGuard used

incorrect estimation formulas in light of the non-normal distribution, thereby

invalidating its extrapolation calculation.  *Id.* at 33.

In support of the Council's decision, the Secretary asserts that the

Council "correctly determined that the sampling and extrapolation were

consistent with the applicable guidelines for administrative Medicare post-

payment reviews."  ECF No. 24 at 9.  The Secretary argues that the

Medicare guidelines afford contractors great latitude in sample design, and

there is a presumption that a ZPIC's sampling and extrapolation have been

conducted adequately.  The Secretary points to the MPIM as recognizing "a

number of sampling designs as acceptable designs, including stratified

sampling, as well as simple random sampling, systematic sampling, cluster

sampling, or a combination thereof."  *Id.* at 13 (citing MPIM § 3.10.4.1).

The Secretary contends that a contractor is not required to use the most

precise methodology that might be devised, because the guidelines take

into account a level of uncertainty to ensure fairness to physicians by

directing that overpayments be assessed at the lower level of a confidence interval.  *Id.* at 13-14.  The Secretary argues that the Council discussed SafeGuard's sampling and extrapolation procedures in some detail and concluded that there was nothing in SafeGuard's processes that in any way violated the sampling guidelines in the MPIM.  *Id.* at 16 (citing R. 17).  The Secretary contends that Plaintiff has failed to identify any error in the Council's decision not to accept Dr. Haller's opinion that the sampling unit should have been "principal diagnoses" on the billed claims, because the MPIM does not reference "principal diagnosis" as a potential sampling unit, let alone prescribe it as necessary.  *Id.* at 16-17.  The Secretary further contends that the argument that sampled units must follow a "normal distribution" has consistently been rejected by the Council and reviewing courts.  *Id.* at 17-18.

The Secretary notes that Plaintiff complains that SafeGuard's chief statistician who created the statistical methodology and extrapolation in this case, Alina Moya, did not testify at the ALJ hearing to refute Dr. Haller's opinion.  *See* ECF No. 23 at 9.  The Secretary contends that it was not necessary for SafeGuard's chief statistician to participate in the hearing. SafeGuard had previously submitted for the record Ms. Moya's report in

response to contentions raised by Plaintiff's previous expert, Dr. Bruce Kardon.  *Id.* at 18-19.[7]

Lastly, the Secretary argues that Plaintiff did not establish that a different sampling design would have yielded materially different results. *Id.* at 19-20.  In sum, the Secretary contends that the Council's decision comported fully with the applicable Medicare program guidelines, as set forth in the MPIM, and that the decision upholding the sampling and extrapolation methods was supported by substantial evidence.  *Id.* at 20.

## V.  Discussion

The Court turns first to Plaintiff's argument that the Council erred as a matter of law by failing to apply "the prevailing laws and assumptions of probability and statistics when imposing extrapolated overpayment assessments based on a review of a sample of claims." ECF No. 23 at 19. Plaintiff's expert, Dr. Haller, provided declarations and testimony during the administrative review process in which he opined that SafeGuard did not obtain a statistically valid sample and used incorrect formulas for estimation and extrapolation.  *See* R. 78-92 (Dr. Haller's 6/30/17 response to CMS'

---

[7] The Kardon and Moya reports were submitted in the Supplemental Record, ECF No. 29.  Plaintiff does not dispute that the record before the ALJ included the statistician's reports and documentation of the sampling methodology, and another SafeGuard statistician, Noel McKetty, testified at the hearing.  *See* R. 222-24.  For these reasons, Ms. Moya's failure to testify at the ALJ hearing provides no basis for concluding that the Agency's decision is not supported by substantial evidence.

request for own-motion review); 223-24 (ALJ Decision summarizing Haller

testimony), 2521-31 (Dr. Haller's 6/22/16 declaration for ALJ hearing).

As summarized in the CMS referral memorandum, Dr. Haller

"proposes that references to statistical texts in the MPIM means that the

'theoretical details of sampling' set forth in those texts 'must be followed if

the extrapolation is to be valid.'"  R. 65.  With respect to his position that the

distribution of sampled claims must be normal, CMS pointed to Dr. Haller's

argument that:

> The Central Limit Theorem states that the average of a random
> sample of independent, identically distributed random variables from
> a universe that has a finite variance tends to the normal distribution
> as the sample size tends to infinity.

> However Cochran on page 42 of his text, *Sampling Techniques,*
> states that "*There is no safe general rule as to how large n [the
> sample size] must be for use of the normal approximation in
> computing confidence limits.*"  Thus the distribution of the stratified
> sample average must be tested statistically and shown to be normal
> before the confidence limits can be used to provide an estimate of the
> population mean that has a probability of 95% of the population mean
> exceeding this value.  This is a necessary condition for the
> extrapolation methodology to be valid based on Cochran's text,
> *Sampling Techniques,* Section 2.15.

*Id.* at 66 (citing Dr. Haller's 6/22/16 declaration).

The CMS argued to the Council that "[a]lthough the MPIM lists

several sampling resources, it does not incorporate the "theoretical details"

of those texts into CMS sampling requirements.  As the [Council] has

18

explained in similar cases, 'Dr. Haller attempts to impose standards derived

from academic texts, when such standards are not contemplated or

required by CMS . . . [T]here is no support in CMS Ruling 86-1 or in the

MPIM for the proposition that 'non-normality of the average of sampling

units within a single sample demonstrate[s] that the sample is statistically

invalid.' *Id.* (internal citations omitted).

The Council agreed with CMS and rejected Plaintiff's argument. The

Council observed that the MPIM sampling guidelines

> reflect the perspective that the time and expense of drawing and
> reviewing the claims from large sample sizes and finding point
> estimates which accurately reflect the estimated overpayment with
> relative precision may not be administratively or economically feasible
> for contractors performing audits. Instead, the guidelines allow for
> smaller sample sizes and less precise point estimates, but offset such
> lack of precision with direction to the carriers to assess the
> overpayment at the lower level of a confidence interval – generally
> the lower level of a ninety percent one-sided confidence interval.
> This results in the assumption, in statistical terms, that there is a
> ninety percent chance that the actual overpayment is higher than the
> overpayment which is being assessed, thus giving the benefit of the
> doubt resulting from any imprecision in the estimation of the
> overpayment to the appellant, not the agency. As a result of the
> above policy decision, the question becomes whether the sample
> size and design were sufficiently adequate to provide a meaningful
> measure of the overpayment, and whether the provider or supplier is
> treated fairly despite any imprecision in the estimation.

R. 10-11.

The Council observed that the MPIM permits contractors to employ

"any sampling methodology that results in a 'probability sample.'" *Id.* at 10

(citing MPIM § 3.10.1.1).  Further, the "MPIM recognizes that a number of sampling designs are acceptable, including simple random sampling, systematic sampling, stratified sampling, and cluster sampling, or a combination of these."  *Id.* (citing MPIM § 3.10.4.1).  The Council observed that the level of uncertainty in a sampling design can be addressed when the results are used to estimate the total overpayment in a variety of ways, including (for stratified sampling) by finding a point estimate for each stratum separately and adding the weighted stratum estimates together to produce an overall point estimate.  *Id.* (citing MPIM § 3.10.5.1).

By concluding that SafeGuard's sampling methodology comported with the MPIM's flexible guidelines, the Council rejected Plaintiff's assertion that its sampling was subject to the "theoretical details" of the statistical texts identified as resources in the MPIM.  Plaintiff points to no authority holding that sampling methodology must conform to the texts identified in the MPIM resources section, and other courts considering that argument have rejected it.  *See e.g.*, *Maxmed Healthcare, Inc. v. Price*, 860 F.3d 335, 341 (5th Cir. 2017) (considering same argument made by Dr. Haller and concluding that Agency did not err in relying on sampling guidelines in CMS Ruling 86-1 and MPIM); *Rio Homecare LLC v. Azar,* 2019 WL 1411805 (S.D. Tex. 2019) (unpublished) ("Rio's reliance on MPIM § 8.4.10 is

misplaced. Section 8.4.10 is entitled "Resources," and it merely lists ten statistical books and texts. Nowhere in the MPIM does it suggest that these "Resources" trump the guidance in the manual.").

The Council's interpretation of the CMS regulations and guidelines, including the MPIM, are entitled to deference. *Charter Peachford Hosp., Inc. v. Bowen*, 803 F.2d 1541, 1543–44 (11th Cir. 1986) ("An agency's interpretation of a regulation it has been authorized to promulgate is . . . entitled to great deference and must be upheld unless it is unreasonable, arbitrary and capricious or inconsistent with the statute.")  On this record, Plaintiff has not shown that the Council erred as a matter of law in concluding that SafeGuard was not bound by the statistical resources identified in the MPIM in performing its overpayment extrapolation.

Plaintiff argues that the Council failed to properly consider and account for Dr. Haller's opinion that SafeGuard's sample as drawn was "biased and not representative of the larger universe" because SafeGuard chose a sampling unit based on individual beneficiaries whose claims had been stratified by total amount paid per beneficiary.  Dr. Haller opined that the sample was biased toward beneficiaries with a higher volume of claims and was not representative of the frame with respect to principal diagnoses or procedure codes . ECF No. 23 at 24 (citing R. 2527-29).  According to

Dr. Haller, because the sample was biased and not representative of the frame, it was not a statistically valid random sample and therefore it was not eligible to be extrapolated.  *Id.* at 31 (citing R. 84).

The MPIM describes "[s]ampling units" as "the elements that are selected according to the design of the survey and the chosen method of statistical sampling."  The MPIM provides that the sampling units may be an individual line(s) within claims, individual claims, or clusters of claims (e.g., a beneficiary)."  MPIM § 3.10.3.2.2. "In principle, any type of sampling unit is permissible as long as the total aggregate of such units covers the population of potential mis-paid amounts." *Id.* As the Council held, nothing in the MPIM identifies "principal diagnosis" as a potential sampling unit. The Council observed that "[m]ost Medicare overpayment sampling methodologies are based on amounts paid per claim, per beneficiary, or per billed procedure code, depending on the sampling unit."  R. 17.  The Council concluded that Dr. Haller "has not indicated how any focus on princip[al] diagnosis would have potentially affected the outcome in this case."  *Id.*  The Council acknowledged that many Medicare overpayment methodologies are designed to focus on a limited number of billed codes of a particular provider, but that in this case SafeGuard looked at *all* codes billed during the period under review.  The Council concluded:

> In choosing the sample unit as the beneficiary, rather than the claim or a specific line item or billing code, the ZPIC focused on the total overall billing of [Plaintiff].  In fact, the case record reflects that the [Plaintiff] billed at least **84** different procedure codes for this service period.  It would not be practical for the ZPIC to review a statistically significant number of line items for each billing code – or to stratify based on the basis of billing code – when the volume of individual codes would be so numerous and would, in any event, not assess the overall extent of the [Plaintiff's] billing per beneficiary.

*Id.* at 18.  The Council considered that the testing conducted by Dr. Haller "may very well establish that the sampling results did not include a number of beneficiaries or claims with each principal diagnosis code or each of the many billing codes" but those were not the factors being measured and did not cause the statistical sampling to be "fatally flawed".  *Id.*

In the same vein, the Council considered Dr. Haller's contention that his testing showed that the total amounts paid per beneficiary in the sample were significantly higher than those paid amounts per beneficiary in the frame, and that the sampled beneficiaries had a higher volume of claims per beneficiary than among the beneficiaries in the overall frame.  *Id.* The Council acknowledged that a larger "*proportion or percentage"* of the beneficiaries with higher total dollars paid and numbers of claims were selected for the sample, because the beneficiaries were grouped in strata according to total amounts paid rather than evenly divided by number of beneficiaries.  The Council concluded that this factor "had no bearing on

the overall overpayment assessment because the ZPIC properly weighted the results within each stratum before calculating the point estimate and the overpayment amount."  The Council observed that "[t]his weighting is standard procedure in most stratified samples that the Council reviews."  *Id.* at 19.

As noted previously, this weighting process is recognized expressly in the MPIM.  MPIM § 3.4.5.1 ("In stratified sampling, an estimate is found for each stratum separately, and the weighted stratum estimates are added together to produce an overall point estimate.")  While other sampling units are contemplated in the guidelines and may be preferred by Dr. Haller, on this record the Court cannot conclude that the Council erred as a matter of law in accepting SafeGuard's approach as reasonable, in view of its assessment that the large number of procedure codes made a different approach impractical. SafeGuard's approach is plainly authorized under the MPIM.

Plaintiff next argues that Dr. Haller "established through statistical testing that stratified average overpayments in the sample as drawn and conducted were not normally distributed, and therefore an essential prerequisite for application of SafeGuard's confidence interval formula for

extrapolation was not met." ECF No. 23 at 29 (citing R. 81-84, 87, 89-90,

2529-31). The Council addressed this argument as follows:

> [A]s the Council has previously found, Medicare sampled units in
> estimated overpayments generally do *not* follow a normal distribution.
> The Council would not necessarily expect to see normal distribution
> in a sample where there are such largely varying individual payment
> amounts among the frame's beneficiaries, where individual sampled
> beneficiary overpayments range from $141.62 to $5717.36 across the
> entire sample, and where an equal number of sampled units were
> selected from each stratum. In any event, the Council does not find
> the statistician's arguments to be compelling where the overpayment
> demands are reduced to lower confidence levels in nearly every
> assessment (including here), and the guidelines specifically
> contemplate wide latitude in sampling precision. Ultimately, the
> Council is not convinced that a payment-based stratified sample of 50
> beneficiaries, encompassing 811 claims, must be found invalid on the
> grounds that the total paid amounts and/or sample overpayment
> results are not normally distributed. To do so would suggest that
> most, if not all, confidence interval estimation in Medicare
> overpayment cases could never be upheld. The Council is not so
> persuaded.

R. 20.

Plaintiff has not established that the Council's decision on this point

reflects any error of law. The MPIM provides for recovery of an

overpayment amount "that is very likely less than the true amount of

overpayment" and "allows a reasonable recovery without requiring the tight

precision that might be needed to support a demand for a point estimate."

MPIM § 3.4.5.1. The MPIM does not support Dr. Haller's opinion that the

extrapolation was invalid because the distribution of average overpayments

was not normally distributed.  Accordingly, the Council reasonably

concluded that Plaintiff failed to carry his burden of showing that the

statistical sample was invalid on this basis, and not "simply that 'another

statistician might construct a different or more precise sample.'"  *Maxmed*

*Healthcare v. Burwell,* 152 F.Supp.3d 619, 637 (W.D. Tex. 2016), *aff'd* 860

F.3d 335 (5th Cir. 2017) (quoting *John Balko & Assocs., Inc. v. Sec'y U.S.*

*Dep't of Health & Human Servs.*, 555 F. App'x 188, 194 (3d Cir. 2014)); *Rio*

*Homecare, LLC,* 2019 WL 1411805 at *27 (rejecting same argument that

statistical sample was invalid because it was not normally distributed); *see*

*Palm Valley Healthcare,* 947 F.3d 321, 340 (extrapolation methodology in

MPIM constitutes substantial evidence in support of agency's decision).

Finally, as the Secretary contends, Plaintiff has not established that a

different sampling design or extrapolation method would have or could

have yielded materially different results in this case.  Plaintiff's expert

acknowledged that he "made no attempt to suggest or recommend

improved, alternative, or more precise methods of estimate and

extrapolation."  R. 78.  Plaintiff could have done so, for example, by

presenting "evidence of a different random sample from the universe of

claims that yields a lower rate of denials or prove that the projection is not a

true estimate of the rate of denials in the non-sample universe." *Chaves*

*County Home Health Serv., Inc. v. Sullivan*, 931 F.2d 914, 921 (D.C. Cir. 1991); *see also Schuldt Chiropractic Wellness Ctr. v. Sebelius,* 2014 WL 247972, at *4 (D. Neb. Jan. 22, 2014) (same, citing *Chaves,* 931 F.2d at 921); *Pruchniewski v. Leavitt*, 2006 WL 2331071, at *15 n.20 (M.D. Fla. Aug. 10, 2006) ("[N]othing prevented Plaintiff from showing an error in the Carrier's calculations or demonstrating through his own, more reliable, sampling method an estimated overpayment that was less than the lower limit of the 90% confidence interval calculated by the Carrier.").

## VI.  Conclusion

For the foregoing reasons, the undersigned concludes that the Council's decision upholding the statistical sampling and extrapolation in this case is supported by substantial evidence and reflects the application of correct legal standards.  It is therefore respectfully **RECOMMENDED** that the Council's decision should be **AFFIRMED.**

**IN CHAMBERS**  this 15th day of January 2021.

*s/Gary R. Jones*

GARY R. JONES
United States Magistrate Judge

## NOTICE TO THE PARTIES

Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  **Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.**  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.

.